IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| WENDY WILKER and<br>MICHAEL WILKER,<br><br>*Plaintiffs,*<br><br>vs.<br><br>US SERVICES, LLC;<br>WILLIE MURRAY ROBINSON, *et al.,*<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)    CASE NO. 2:07-cv-00232-MEF<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR PROTECTIVE ORDER

NOW COME the plaintiffs, WENDY WILKER and MICHAEL WILKER, by and through

their attorney, and move the Court, pursuant to Rule 26(c)(1) for a protective order

forbidding the second deposition of the plaintiff's treating physician, Dr. N. Tucker Mattox,

and, for reason, the plaintiffs would show unto the Court as follows:

1.    That the defendants have served the plaintiffs with a copy of a subpoena

stating that the deposition of Dr. N. Tucker Mattox will be taken on Thursday, August 28,

2008 at 11:30 a.m. (see Exh. A attached hereto).

2.    Although the defendants did provide a copy of the referenced subpoena, the

second deposition of Dr. Mattox was not noticed pursuant to Rule 30, FRCP.

3.    That Dr. N. Tucker Mattox is one of Plaintiff Wendy Wilker's initial treating

physicians and his deposition was taken pursuant to Rule 30, FRCP, on Thursday, January

17, 2008 (a compressed transcript of the deposition of Dr. N. Tucker Mattox is attached

hereto as Exh. B).

4.      That counsel for the defendants, who now proposes a second deposition of Dr. Mattox, attended the January 17, 2008 deposition and participated therein by asking extensive questions, without limitation (see page 68–79).

5.      That Dr. Mattox last saw Wendy Wilker on August 8, 2007, and has not provided any treatment to or for her since that date (see p. 59, Dep. of Dr. Mattox).

6.      That Dr. Mattox stated in his deposition that in order to determine whether Wendy Wilker needs a knee replacement in the future, since he (Dr. Mattox) had not seen her in six months, he could not give that opinion (see pp. 63-64, Dep. of Dr. Mattox).

7.      That Wendy Wilker transferred the management of her care to Dr. Glenn C. Terry and first saw Dr. Terry on August 17, 2007 in Columbus, Georgia.

8.      That the deposition of Dr. Terry was indeed taken, pursuant to Rule 30, FRCP, on August 11, 2008, at which time, Dr. Terry gave the full details of treatment received by Wendy Wilker at the Hughston Clinic and also stated his opinion regarding Wendy Wilker's need for future medical treatment to include a total knee replacement.

9.      Counsel for the defendants attended and participated in Dr. Terry's deposition on August 11, 2008.

10.     The defendants now propose a second deposition of Dr. Mattox, after he has already been deposed on January 17, 2008, and even though Dr. Mattox stated in his deposition that he would need to see Wendy Wilker again in order to state any further opinions about the total knee replacement issue.  At this late date, it has now been over one

year since Dr. Mattox last saw Wendy Wilker as a patient; hence, Dr. Mattox's inability to testify further on Wendy Wilker's future medical treatment, which inability Dr. Mattox candidly admitted in January, 2008, is now more so evident inasmuch as due to the passage of time (an additional eight months), Dr. Mattox still has not seen Wendy Wilker, as she has transferred the management of her care.

11.     The plaintiffs would show unto the Court that a second deposition of Dr. Mattox should not occur as proposed by the defendants because: (a) the proposed deposition would be duplicative as described previously in this motion; (b) Dr. Mattox has already testified that he would be unable to give any further opinions without seeing the patient again, and there has been no return office visit; and (c) further, the defendants failed to notice the deposition pursuant to Rule 30, FRCP.

WHEREFORE, THE PREMISES CONSIDERED, the plaintiffs move the Court to enter an order that the proposed deposition of Dr. N. Tucker Mattox shall not occur.

Respectfully submitted,

/s/ David E. Allred
DAVID E. ALLRED
D. CRAIG ALLRED
Attorneys for Plaintiffs

OF COUNSEL:

ALLRED & ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone:    (334) 396-9200
Facsimile:    (334) 396-9977
E-Mail:    dallred@allredpclaw.com
          callred@allredpclaw.com

JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, Alabama 36117
Telephone:     (334) 213-2323
Facsimile:      (334) 213-5663

## CERTIFICATE OF SERVICE

I hereby certify that I have this 25th day of August, 2008 electronically filed the foregoing *Motion for Protective Order* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system, which will send notification of such filing to:

Jack J. Hall, Jr., Esq.
HALL, CONERLY & BOLVIG, P.C.
Suite 1400 Financial Center
505 North 20th Street
Birmingham, Alabama   35203-2626

_/s/ David E. Allred_
OF COUNSEL

ISSUED IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT
OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| WENDY WILKER and MICHAEL WILKER, | ) ) ) | |
| Plaintiffs, | ) ) | SUBPOENA IN A CIVIL CASE |
| vs. | ) ) | Case No.:    2:07-cv-00232-MEF |
| U.S. SERVICES, LLC.; WILLIE MURRAY ROBINSON, et al., | ) ) ) | |
| Defendants. | ) ) | |

TO:   Dr. Tucker Mattox, Jr.
      2119 East South Boulevard
      Suite 200
      Montgomery, Alabama 36116

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

X YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Southern Orthopaedic Surgeons, LLC 2119 East South Boulevard Suite 200 Montgomery, Alabama 36116 | Thursday, August 28, 2008 Time: 11:30 a.m. |

☑ YOU ARE COMMANDED to produce and permit inspection, copying, and mailing of the following documents or objects at the place, date, time specified below (list documents or objects):

    All records including the **complete patient file**, all statements for services and expenses (all bills), and all insurance records, correspondence and dictation in the patient file, relating to the examination, diagnosis, treatment and prognosis of: Wendy Wilker, DOB: 8/1/1968 This is not a limited request and includes all documents held in your possession related to this individual.

| PLACE | DATE AND TIME |
|---|---|
| | |



□ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 08/18/08 |
|---|---|

Jack J. Hall Jr. Hall, Conerly, & Bolvig, P.C., 505 N. 20 th Street, 1400 Financial Center,
ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Birmingham, AL 35203; phone: 205-251-8143

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

1

   If action is pending in district other than district of issuance, state district under case number.


Jack J. Hall, Jr.
Attorney for Defendants, Willie Murray Robinson and US Services LLC

OF COUNSEL:

HALL, CONERLY & BOLVIG, P.C.
1400 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 251-8143

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this 18th day of August, 2008, served a copy of the above and foregoing pleading on counsel of record by placing same in the U.S. Mail, first-class postage and prepaid properly addressed to:

Kenneth J. Mendelsohn
JEMISON & MENDELSOHN, P. C.
P.O. Box 241566
Montgomery, Alabama 36124-1566

David E. Allred
DAVID E. ALLRED, P.C.
P.O. Box 241594
Montgomery, Alabama 36124-1594

                              /s/ Jack J. Hall, Jr.
                              Of Counsel

Rule 45. Federal Rules of Civil Procedure. Parts C & D:

(c)　　PROTECTION OF PERSONS SUBJECT TO SUBPOENAS

　　(1)　　A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

　　(2) (A)　　A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

　　(B)　　Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoenas shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party significant expense resulting from the inspection and copying commanded.

　　(3)(A)　　On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

　　　　(i)　　fails to allow reasonable time for compliance;

　　　　(ii)　　requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

　　　　(iii)　　requires disclosure of privileged or other protected matter and not exception or waiver applies, or

　　　　(iv)　　subjects a person to undue burden

　　(B)　　If a subpoena

　　　　(i)　　requires disclosure of a trade secret or other confidential research development, or commercial information, or

　　　　(ii)　　requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

　　　　(iii)　　requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoenas, quash or modify the subpoena or if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonable compensated, the court may order appearance or production only upon specified conditions.

(d)　　DUTIES IN RESPONDING TO SUBPOENA:

　　(1)　　A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand

　　(2)　　When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communication, or things not produced that is sufficient to enable the demanding party to contest the claim.

# DEPOSITION OF N. TUCKER MATTOX, M.D.

## January 17, 2008

## Pages 1 through 81

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

EXHIBIT

B

Deposition of N. Tucker Mattox, M.D.        Wilker vs. US Services        January 17, 2008

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                NORTHERN DIVISION
 4
 5   WENDY WILKER and
     MICHAEL WILKER,
 6
            Plaintiffs,
 7
        vs.          CIVIL ACTION NO.
 8                   2:07-cv-00232-MEF
 9   US SERVICES, LLC;
     WILLIE MURRAY ROBINSON, et al.,
10
            Defendants.
11
12        * * * * * * * * * * * *
13
14
15      VIDEOTAPED DEPOSITION OF N. TUCKER MATTOX,
16   M.D., taken pursuant to stipulation and agreement
17   before Lyn Daugherty, ACCR #66, Certified Court
18   Reporter and Commissioner for the State of Alabama
19   at Large, in the Offices of Southern Orthopaedic
20   Surgeons, 2119 East South Boulevard, Suite 200,
21   Montgomery, Alabama, on Thursday, January 17th,
22   2008, commencing at approximately 12:00 p.m.
23        * * * * * * * * * * * *
```

---

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. David E. Allred
     LAW OFFICES OF DAVID E. ALLRED, P.C.
 5   Attorneys at Law
     7030 Fain Park Drive, Suite 9 (36117)
 6   P.O. Box 241594
     Montgomery, Alabama 36124-1594
 7
 8   FOR THE DEFENDANT:
 9   Mr. Jack J. Hall, Jr.
     HALL, CONERLY & BOLVIG
10   Attorneys at Law
     505 North 20th Street, Suite 1400
11   Birmingham, Alabama 35203-2626
12
13   ALSO PRESENT: Mr. Vic Griswold, Videographer
14        * * * * * * * * * * * *
15
16           EXAMINATION INDEX
17
18   N. TUCKER MATTOX, M.D.
19      BY MR. ALLRED . . . . . . . . . .  6
20      BY MR. HALL . . . . . . . . . . . 69
21      BY MR. ALLRED . . . . . . . . . . 76
22      BY MR. HALL . . . . . . . . . . . 78
23
```

---

Page 3

```
 1              EXHIBIT INDEX
 2                    MAR
     Plaintiff
 3
     A   Curriculum vitae              8
 4
     1   Copy of Dr. Mattox's records     13
 5
     2   Bill from Southern Orthopaedic Surgeons   64
 6
     2-A Bill from Southern Orthopaedic Surgeons   65
 7
     3   Bill from Baptist South in the amount of   66
 8       $58,060.64
 9   4   Bill from Baptist South in the amount of   66
         $9,884.55
10
     4   Bill from Baptist South            66
11
     5   Bill from Baptist South in the amount of   67
12       $12,995.15
13
14
15        * * * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

---

Page 4

```
 1              STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of N. TUCKER MATTOX, M.D. is taken
 5   pursuant to the Federal Rules of Civil Procedure
 6   and that said deposition may be taken before Lyn
 7   Daugherty, Certified Shorthand Reporter, and
 8   Commissioner for the State of Alabama at Large,
 9   without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 5

1 between the parties hereto and the witness that the
2 signature of the witness to this deposition is
3 hereby waived.
4           * * * * * * * * * * * *
5           VIDEOGRAPHER: This is the
6                deposition of Dr. Tucker
7                Mattox taken in the matter of
8                Wendy Wilker and Michael
9                Wilker, Plaintiffs, versus US
10               Services, LLC, Willie Murray
11               Robinson, et al., Defendants,
12               Case Number 2:07-cv-00232-MEF
13               held in the United States
14               District Court for the Middle
15               District of Alabama Northern
16               Division. Today is January
17               17th, 2008. We're at the
18               offices of Southern
19               Orthopaedic Surgeons in
20               Montgomery, Alabama, and the
21               local time is 12:03 p.m. If
22               counsel will introduce
23               themselves, we can have the

Page 6

1                oath, please.
2           MR. ALLRED: I'm David Allred, and
3                I'm here for the plaintiff,
4                Wendy Wilker.
5           MR. HALL: I'm Jack Hall. I'm
6                here for the defendants in
7                this case.
8           COURT REPORTER: Can you raise
9                your right hand and be sworn,
10               please.
11          * * * * * * * * * * * *
12          N. TUCKER MATTOX, M.D.
13     The witness, after having first been duly sworn
14 to speak the truth, the whole truth and nothing but
15 the truth testified as follows:
16               EXAMINATION
17 BY MR. ALLRED:
18 Q. Dr. Mattox, good afternoon. I'm David
19     Allred, and I'm here to take your
20     deposition on behalf of Wendy Wilker in a
21     case that's pending in federal court
22     against US Services, a trucking company,
23     and Mr. Robinson, the driver. And we're

Page 7

1                going to take this deposition on videotape
2     .          and then we'll play it later when the case
3                is tried. Is that agreeable with you?
4 A. Yes.
5 Q. All right, sir. And I believe generally
6                the judges in federal court like for us to
7                ask the witness if you want to read and
8                sign the deposition or if you waive reading
9                and signing of the deposition. Do you want
10               to waive signature?
11 A. I would waive, yes.
12 Q. All right, sir. Tell us, if you will, your
13               full name and your professional address.
14 A. My name is N. Tucker Mattox. I'm an
15               orthopedic surgeon with Southern
16               Orthopaedic Surgeons, 2000 Normandie
17               Drive. Actually —
18 Q. All right, sir. And —
19 A. 2193. Is it 2193? We just moved last
20               week.
21 Q. Okay. Y'all moved from down on Normandie
22               to the old —
23 A. The corner to the second floor of the

Page 8

1                cardiovascular building.
2 Q. Okay. And that move was accomplished just
3                recently?
4 A. In the last month.
5 Q. Okay. Are you in practice with
6                Dr. Hodurski and others?
7 A. Dr. Hodurski is one of the senior members
8                of our group.
9               (Plaintiff's Exhibit A was marked
10                for identification.)
11 Q. And tell us just very briefly — We have a
12               copy of your CV, which will be introduced
13               as Plaintiff's Exhibit A. But just tell us
14               about your professional education and your
15               experience, please, sir.
16 A. Okay. Educated undergraduate at Auburn
17               University, medical school in Birmingham at
18               the University of Alabama. I did an
19               internship in orthopedic surgery residency
20               in Chattanooga, Tennessee, completed in
21               '96. I took orthopedic boards following
22               that and joined practice here in Montgomery
23               with Southern Orthopaedic 11 and a half

Page 9

1  almost 12 years ago.  I recertified two
2  years ago.
3  Q.  And so you've been practicing in Montgomery
4  about 12 years; is that right?
5  A.  This June will be 12 years.
6  Q.  Okay.  And you mentioned that you're board
7  certified.  What -- Explain that to us, if
8  you will.
9  A.  Board certification is necessary to
10  practice orthopedic surgery.  You have to
11  complete an accredited orthopedic surgery
12  residency program and take a written
13  examination and then two years later have
14  an oral examination based on cases and
15  scenarios.
16  Q.  All right, sir.  And you fulfilled those
17  requirements to be board certified; is that
18  right?
19  A.  Yes.
20  Q.  Tell us, if you will, very briefly what
21  does -- what kind of practice is orthopedic
22  surgery?  Is that bone and joints?
23  A.  Orthopedic surgery is the practice of

Page 10

1  taking care of patients that either have
2  bone or joint injuries or arthritic
3  conditions.
4  Q.  All right, sir.  And you're licensed to
5  practice medicine in Alabama, of course?
6  A.  Yes.
7  Q.  Licensed in any other states?
8  A.  No.  I used to be licensed in Tennessee
9  when I was a resident, but no longer.
10  Q.  During the course of your practice,
11  Dr. Mattox, have you had an occasion to see
12  and treat a lady named Wendy Wilker?
13  A.  Yes.
14  Q.  When did you first see her, please, sir?
15  A.  First met Ms. Wilker on the 17th of
16  January, 2007.
17  Q.  And where was that?
18  A.  Baptist Medical Center South.
19  Q.  Okay.  Since that speaker was going off --
20  A.  May I take that phone off the hook so we
21  won't --
22  Q.  Sure.  Absolutely.
23       (Brief pause.)

Page 11

1  A.  Okay.  Where were we?
2  Q.  Talking about when you first saw or met
3  Wendy Wilker.
4  A.  January 17th of 2007.
5  Q.  And where was that?
6  A.  At Baptist Medical Center South.
7  Q.  Was that in the emergency room?
8  A.  Yes.
9  Q.  Okay.  And what was her complaint or what
10  did you find when you met Ms. Wilker?
11  A.  She had presented to the emergency room at
12  Baptist South after being involved in a
13  motor vehicle accident.  She had been
14  evaluated by the medical staff, including
15  the ER doctor at Baptist South, and was
16  found to have orthopedic injuries, so they
17  consulted me to come see her in the
18  emergency room subsequently to perform
19  surgery on her.
20  Q.  Had she been brought to the hospital in an
21  ambulance as far as you know?
22  A.  As far as I know.
23  Q.  And an emergency room doctor would have

Page 12

1  seen her at Baptist South?
2  A.  Yes.
3  Q.  And then when they -- emergency room
4  doctors find something that needs to be
5  treated or whatever, they call in a
6  specialist like you; is that right?
7  A.  Right.
8  Q.  And what did you do with regard to
9  addressing her orthopedic injuries?
10  A.  She -- At that time we found her to have an
11  open right tibia fracture, which is a lower
12  leg below the knee.  Open meaning that it
13  was a compound or open fracture.  So that
14  would require urgent addressing, usually
15  with irrigation, debridement.  And in her
16  situation I put an intramedullary nail,
17  which is a rod down the inside of the bone
18  to secure it.  Also, she had a fracture of
19  her left knee, which is a tibial plateau
20  fracture is the technical term.  And at the
21  same time she had open reduction internal
22  fixation, which is basically open that up
23  and placing -- place screws to fix the

Page 13

1  fracture. She also had a broken right --
2  excuse me -- left foot that we just placed
3  in a cast.
4 Q. Okay. So the -- How did you diagnose these
5  fractures? Was that done by x-ray?
6 A. By examination and x-ray, yes.
7 Q. And looking here with regard to some of
8  your records -- and we have a copy of your
9  records that you had sent to us at our
10  request. And at this time I move to
11  introduce them -- they're pages -- we have
12  them Bates stamped and they're scanned.
13  They're pages 1 through 154, and that's a
14  copy of what you have there. And that will
15  be Composite Exhibit 1. But let me refer --
16  you to this operative report, which is
17  dated January 18th of 2007. Is that what
18  you're looking at?
19   (Plaintiff's Exhibit 1 was marked
20   for identification.)
21 A. Yes.
22   MR. HALL: I want to object to the
23   form of the question.

Page 14

1 Q. When you have down there under preoperative
2  diagnosis and you have type 3A open right
3  tibial shaft fracture, first of all, where
4  is the right tibia?
5 A. The tibia is the long bone that runs from
6  the knee to the ankle. There's two bones
7  there. The tibia is the larger of the two
8  bones.
9 Q. All right. So she had an open fracture in
10  that right long bone on the right leg?
11 A. Yes.
12 Q. I mean, in the long bone on the right leg.
13 A. Right.
14 Q. Is that right?
15  When you say open fracture, does that
16  mean that it broke the skin?
17 A. That's correct. The bone was protruding
18  from the skin. We grade it one through
19  three, and threes are graded A, B and C.
20  So three would indicate that it's a
21  relatively large wound. The fact that it's
22  an A meant that it was enough skin coverage
23  to cover the bone when I was complete.

Page 15

1 Q. Okay. So you diagnosed it as a type 3A
2  open right tibial shaft fracture?
3 A. Yes.
4 Q. Okay. Right?
5 A. Uh-huh (positive response).
6 Q. Then the second part of your diagnosis you
7  said closed left bi -- well, you can
8  probably --
9 A. Bicondylar.
10 Q. -- pronounce that if you will.
11 A. Bicondylar.
12 Q. Tibial plateau fracture?
13 A. Yes.
14 Q. And that's on the other side; is that
15  correct?
16 A. Yes.
17 Q. All right. And that's the same long bone,
18  but it's on the left side, so that --
19 A. Well, it's at the knee, right. The tibia,
20  when it comes up and forms the bottom end
21  of the knee joint, that's the tibial
22  plateau is the technical term for that.
23  Hers was broken there.

Page 16

1 Q. That left tibial plateau fracture, did that
2  extend into the joint itself?
3 A. Yes.
4 Q. Then you have diagnosis of fifth metatarsal
5  fracture left foot. Where is the fifth
6  metatarsal just generally?
7 A. That's on the outside part of the foot, you
8  know, proximal or above the toes.
9 Q. All right, sir. Now, when you made those
10  diagnoses -- Well, first of all, was
11  Ms. Wilker given some pain medication to
12  reduce her pain?
13 A. I would assume -- and I don't recall
14  specifically what she was given and what
15  she was not. But typically if she arrived
16  with these type of injuries she would have
17  been evaluated by the emergency room doctor
18  and given -- started an IV and given some
19  pain medicine, yes.
20 Q. All right, sir. Then what did you do after
21  you made the diagnosis? Did you take her
22  to surgery or what -- Explain to us what
23  you did.

Page 17

1    A.  I would have seen her in the emergency room
2       and then taken her over urgently to the
3       operating room to have this procedure
4       performed.
5    Q.  All right, sir.  Now, the procedure you
6       did, is that under a general anesthesia?
7    A.  Yes.
8    Q.  And did you have -- It says here you had an
9       assistant, a Ms. -- Nurse Stevens was your
10      assistant; is that right?
11   A.  That's correct.
12   Q.  Was there an anesthesiologist involved as
13      well, or did you take care of that?
14   A.  Anesthesiologist would have been putting
15      him to sleep -- her to sleep.  Excuse me.
16   Q.  The injury that you diagnosed, would that
17      be consistent with being in an automobile
18      truck accident?
19   A.  Yes.
20   Q.  Motor vehicle accident.  Was that the
21      history you were given?
22   A.  Yes.
23   Q.  Do you recall whether the patient was

Page 18

1       conscious when you were examining her?
2    A.  I honestly cannot recall.
3    Q.  Now, when you made the diagnosis, then, you
4       take her to the operating room, and under
5       general anesthesia explain to us what you
6       did, Dr. Mattox.
7    A.  Well, once she was under anesthesia, we did
8       what we just really talked about.  Washed
9       out the -- cleaned out the wound where the
10      bone came out, which is to make it less at
11      risk for infection.  When the bone comes
12      through the skin, especially a fracture,
13      it's at risk for infection.  So we clean it
14      up and then reduce the fracture so that
15      it's back end to end, and I put a nail or a
16      rod down the inside of the bone to secure
17      the bone and then on the opposite side put
18      a plate and screws in that tibial plateau
19      fracture of the left knee.
20   Q.  Dr. Mattox, we're going to be talking about
21      this later, and, of course, you won't be
22      there.  Are there some x-rays that you have
23      that you could show us that would

Page 19

1       demonstrate to some degree the work that
2       you did?
3    A.  I do have just a couple of x-rays that
4       are -- once she arrived at my office.  I do
5       not have x-rays when she came in.  Those
6       are at the hospital.
7    Q.  Okay.
8    A.  The x-rays I have here are of her left
9       knee, if that shows up.  That's the plate
10      and screws I discussed earlier.
11   Q.  How long is that plate on there?
12   A.  It's probably five or six inches long.
13   Q.  And those screws, it looks like they go all
14      the way through the bone.  Do they --
15   A.  Right.  The plate -- which I'll show you
16      the side view which shows the plate
17      better.  It has holes through it.  The
18      screws go through the holes obviously and
19      secure the plate to the bone and then
20      there's a screw that runs from front to
21      back in her situation here.
22   Q.  All right.  Now, that's the one on the left
23      side --

Page 20

1    A.  That's the left knee.
2    Q.  Was that -- Let me ask you about that.  Was
3       that an open fracture on the left side?
4    A.  No.  That was -- That fracture was not
5       open.
6    Q.  Okay.  All right.  What about the right
7       side?
8    A.  Okay.  The right side, if we can see her --
9       the fracture was here.  This x-ray is two
10      months into treatment.  But this is the
11      fracture that came out through the skin
12      here.  The treatment for that is that rod
13      that goes down the inside of the bone.  The
14      tibia and the femur are the two bones in
15      the legs that are like tubes and you can
16      stick a rod down the inside of the bone and
17      put screws on either end to secure it.
18   Q.  How long is that rod that you put in there?
19   A.  Oh, foot and a half.  The length of the
20      lower leg bone.
21   Q.  How do you get it in there, Dr. Mattox?
22   A.  Make an incision at the knee and drill a
23      hole at the top and insert the bone -- the

Page 21

1  rod down the inside of the bone and make a
2  couple of small incisions for those two
3  screws you see there.
4  Q.  Okay.  Is the inside of the bone kind of
5     hollow?
6  A.  In adults it does serve a purpose for bone
7     marrow that serves a purpose to produce
8     other blood cells.  But in adults we don't
9     typically need that bone marrow, so it is
10    relatively hollow.  We put the rod down the
11    inside of the bone to secure it.
12 Q.  Do you just kind of drive it down with a
13    device?
14 A.  Ream it out with some reamers and drive it
15    down, right.
16 Q.  Okay.  And then you put the nail in there
17    and then you put some keepers on it so it
18    won't move around?
19 A.  Well, if you put the rod down without
20    securing it either end, then there would be
21    rotation possibly through the fracture.  So
22    we put a screw on either end that keeps it
23    out the length and also keeps it from

Page 22

1  rotating.
2  Q.  And with regard to the left -- the left
3     leg, in your details of your procedure
4     shown in your operative report there it
5     says you approached that one first.  Was
6     that the more seriously injured leg?
7  A.  She -- Well, she had an open fracture that
8     obviously needed urgent addressing.  But
9     the articular fracture was going to require
10    a plate and screws.  So that's -- it was
11    really no one versus the other was more
12    serious necessarily.
13 Q.  All right.  Well, let me ask about this,
14    because you mentioned something up here
15    under the indications and you say because
16    of the open fracture it was felt I and D --
17    is that irrigation and debridement?
18 A.  Yes.
19 Q.  Is that where you're trying to wash out the
20    foreign material to avoid -- prevent an
21    infection?
22         MR. HALL:  Object to the form.
23 A.  Yes.

Page 23

1  Q.  Is that a big concern with open fractures?
2  A.  Yes.
3  Q.  And what about -- Are there risks involved
4     with fractures of the long bones in the
5     legs?
6         MR. HALL:  Objection.
7  A.  Are there what?
8  Q.  Risks.  What can happen to a patient who
9     has a fracture of long bones in the legs?
10 A.  You mean potential complications?
11 Q.  Right.
12 A.  Well, the tibia, which is the bone that
13    we're talking about here, and the shaft,
14    which is the long portion between the knee
15    and the ankle is at risk for infection.  If
16    it's a compound fracture, it is not a
17    particularly good bone healing-wise.
18    There's a risk of nonunion.  Some patients
19    require a second procedure to get the bone
20    to heal.  There's also risk of shortening
21    or rotation as we discussed.
22 Q.  Okay.  You're saying now because of the
23    comminuted nature of the fracture.  First

Page 24

1  of all, comminuted, does that mean broken
2  in many pieces?
3  A.  Right.  That -- And in this comminuted
4     portion I was talking about the left
5     proximal tibia fracture.  The tibial shaft
6     fracture on the right, which is the one we
7     talked about being open, was relatively
8     transverse and not typically com -- very
9     comminuted.  The left knee injury really --
10    the tibial plateau fracture on the left was
11    I felt to be a worse type of fracture, if
12    you will, for the long-term because it was
13    fractured into the joint where she would
14    have potential risks for arthritis later
15    and that's the fact that it was comminuted
16    or in very small pieces.  That's why I
17    noted here that she was high risk for
18    posttraumatic arthritis.
19 Q.  Tell us, what is posttraumatic arthritis?
20 A.  Posttraumatic arthritis is a term
21    associated with injuries or fractures that
22    go typically into a joint where the
23    articular surface is split.  And in the

Page 25

1  healing process a fracture goes on to heal,
2  but it leaves the articular surface either
3  uneven or deficient of that cartilage, and
4  that cartilage loss puts you at risk for
5  arthritis down the road.
6  Q.  And is that where if you have a fracture
7  into the joint that it might have some
8  roughening in that joint and cause some
9  pain to the patient?
10 A.  Right.  If the articular cartilage is moved
11 lessening cartilage that's on the end of
12 the bone that's there for cushioning and
13 also for -- also just protects the bone on
14 the ends, if you either lose that or if
15 it's uneven or if it's roughened up, then
16 it causes pain and problems --
17 Q.  All right, sir.
18 A.  -- later on for the patient.
19 Q.  You noted in there you said she may require
20 further surgery, including skin grafts or
21 other management in addition to your
22 risk -- assessment of risk of posttraumatic
23 arthritis.  And that was your opinion on

Page 26

1  January 17th of '07; is that right?
2  A.  Going into surgery before we went in I
3  discussed with she and I believe her
4  husband at the same time the serious nature
5  of both of the major injuries we were
6  talking about, the knee and the tibia, and
7  there are various things that possibly
8  could require further management, one of
9  which would be if the skin over the area of
10 the open fracture did not survive and we
11 had to skin graft an area.  There's also a
12 risk of possibly needing bone graft in that
13 area.  That's what I was discussing there.
14 Q.  All right.  Over there on the next page of
15 your operative report up there about three
16 lines down or two lines down you said the
17 fracture was booked open.  What does that
18 mean where you booked it open and --
19 A.  Well, basically that's describing how I did
20 the operation, which I opened it up and the
21 fracture which was split was pulled apart
22 enough to get those small fragments that
23 had been displaced down or the communited

Page 27

1  portion that were no longer where they're
2  supposed to be, I had to take all that out
3  to reassemble the articular surface in the
4  bone at the top.
5  Q.  All right.  You noted in there you found a
6  huge amount of comminuted lateral articular
7  surface of the tibia.  What does that mean?
8      MR. HALL:  Objection to the form,
9      please.
10 A.  Comminuted lateral articular surface,
11 that's what we were talking about with
12 the -- the fracture involved some very
13 small fragments of bone that also had
14 articular cartilage on those.  So what I
15 was indicating there was there was no --
16 there was lots of small fragments.  That's
17 the comminuted or small pieces that were
18 formerly of her articular surface of the
19 tibia.
20 Q.  All right, sir.  And going on down about
21 halfway down in there you said she had some
22 gross contamination on the end of the bone,
23 which was carefully and meticulously

Page 28

1  debrided.  Would that be consistent with
2  having her leg broken in a car and truck
3  wreck?
4  A.  Yes.
5  Q.  Gross contamination, I guess that's where
6  it struck something and got some foreign
7  materials in it.  Would that be correct?
8      MR. HALL:  Objection to the form
9      of the question.
10 A.  Gross contamination is the term for if a
11 fracture is -- comes out through the skin,
12 bone fracture ends come out and there's no
13 evidence of any foreign material, dirt or
14 any kind of outside material, then it's not
15 grossly contaminated.  If you do see some
16 fragments of foreign tissue -- I can't
17 recall if hers was -- it can literally be
18 grass or dirt or pavement or fabric or
19 something like that.  She had something
20 along those lines before debridement, and
21 after the irrigation and debridement took
22 all that out.
23 Q.  And then after you finished your procedure,

Page 29

1   was she placed in the hospital?
2   A.   Yes.
3   Q.   And what was her course in the hospital?
4        What all did you do for her while she was
5        here, and how long was she in the hospital?
6   A.   Well, I honestly can't recall exactly.  I
7        do not have a discharge summary, I don't
8        think.  Because I don't have it in the
9        chart.  I would assume she was in the
10       hospital four or five days.  She required
11       antibiotics, physical therapy, post-op
12       measures.
13  Q.   I believe she was in the hospital from
14       January 17th of '07 to January 25th of
15       '07 -- --- .
16  A.   Okay.
17  Q.   -- according to the bill, the Baptist
18       bill.  Would that be consistent with how
19       you would treat a patient with her type
20       injuries?
21  A.   Yes.
22  Q.   All right, sir.  Did you do any more
23       surgery while she was in the hospital?

Page 30

1   A.   No.
2   Q.   When you discharged Ms. Wilker, did she go
3        home, discharge her to home?
4   A.   Yes.  Discharged to home, yes.
5   Q.   Then did you start seeing her in the
6        office?
7   A.   I saw her on 1/29/07.
8   Q.   Okay.  We have these marked.  Let me show
9        you.  We've got a Bates stamp down at the
10       bottom of it.  It starts with 12.  Yours is
11       not like that.  But these are the copies of
12       the documents that we got from your
13       office.  I want to go through these records
14       here and just, if you would, tell us the
15       high points about them and the course of
16       her office visits and her progress as she
17       came to see you after she was in the
18       hospital.  Did you see her on January the
19       29th of 2007?
20  A.   Yes.
21  Q.   And what was her condition at that time?
22  A.   She had been recently discharged and was in
23       splints or dressings from her surgeries on

Page 31

1        both her left knee and her right lower
2        tibia.  So I saw her back in the office
3        this day and addressed those incisions and
4        wounds and re-splinted, re-dressed, et
5        cetera.
6   Q.   All right, sir.  There's a mention in your
7        January 29th of '07 note you said on x-rays
8        today, meaning January 29th, she had a
9        fragment that looks like it has broken
10       loose, but it seems to be behind the knee.
11       What does that mean?  Which side was that
12       on, first of all, and what does it mean?
13  A.   Well, that was describing the x-rays of the
14       tibial plateau fracture, which was the knee
15       fracture we just discussed a second ago
16       that required the plate and screws.  On
17       the --
18  Q.   That's on the left side?
19  A.   Left knee, right.  Left tibia or knee.
20  Q.   All right.
21  A.   At that point she -- as I described those
22       small fragments and the comminution there.
23       One of those fragments looked like it had

Page 32

1        broken loose or moved from where it was
2        during the surgical procedure and now was
3        in a location where I hadn't left it.  The
4        reason why I discussed that in this
5        dictation was I entertained the thought of
6        taking her back to surgery and taking that
7        fragment out or trying replace it.  But
8        because it was not in the joint, I felt
9        like we should leave it for some -- for --
10       and watch it, which is what we did.
11  Q.   All right.  What's the -- What does it
12       mean -- It says it was a very powdered
13       lateral tibial plateau.  What does that
14       mean?
15  A.   Well, powdered is not necessarily a --
16       that's a term for just very comminuted,
17       broken in lots of small pieces.
18  Q.   Okay.  And she was still having some
19       swelling and pain at that time; is that
20       right?
21  A.   It would be very likely that she would have
22       significant discomfort and swelling still
23       at this point.

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services                    January 17, 2008

Page 33

1  Q.  All right.  And you mentioned her fifth
2      metatarsal fracture.  You said that was in
3      good position; is that right?
4  A.  Yes.  *1-29-07*
5  Q.  She was still non weight bearing, of
6      course, at that time, wasn't she?
7  A.  With both of these fractures, particularly
8      the intra-articular fracture of the tibia,
9      she would be non weight bearing for an
10     extended period of time.
11 Q.  All right.  And what is the observation
12     down in the next to the last line there?
13     You said you were worried about her midfoot
14     and that next sentence there.  What does
15     that mean?
16 A.  Well, she -- Very oftentimes in patients
17     that have multiple orthopedic injuries in a
18     motor vehicle accident, people, after they
19     start getting better with other locations,
20     start having pain that we have not x-rayed
21     or addressed, and that was the situation
22     with Ms. Wilker.  She described some pain
23     in her foot where she had a -- I guess that

Page 34

1      would be the right foot now, the -- where
2      the second metatarsal, which is in the mid
3      part of the foot.  She had pain there.  We
4      x-rayed it in this office visit and found
5      she had a fracture.  And I was concerned,
6      as I said, she might have a Lisfranc, which
7      is a term for a significant intra-articular
8      fracture of the foot.  And I described the
9      fact that we would have to get a CT scan
10     through that area to assess that.  That's
11     what we set her up for at that visit.
12 Q.  Did you send her to Baptist Hospital South
13     for a CT scan?
14 A.  I'm not sure where she got that scan.
15 Q.  Well, did you send her to get a CT scan?
16 A.  She was set up for a CT scan, yes.
17 Q.  All right, sir.  And was that necessary in
18     your opinion as far as her treatment and
19     diagnosis?
20 A.  Yes.
21 Q.  What did the CT scan show?
22 A.  She was -- On the CT scan she had a middle
23     cuneiform, which is one of the smaller

Page 35

1      bones in the midfoot, was broken and in
2      several pieces and also had a fracture of
3      the second metatarsal.  And both of those
4      showed some displacement or shortening,
5      which is where the bone, instead of being
6      out to length and lined up, was shortened.
7      And that's why at this visit I told her
8      that was bad enough that that was going to
9      require surgery to put that back together.
10 Q.  So that would be a second surgery?
11 A.  Yes.
12 Q.  All right.  And did you perform a second
13     surgery?
14 A.  Yes.
15 Q.  What did you do and -- Did you do it at
16     Baptist South?
17 A.  Did it at Baptist South on 2/1/07.
18 Q.  All right, sir.  And describe to us --
19 A.  She had --
20 Q.  Excuse me.  Go ahead.
21 A.  She had open reduction internal fixation,
22     right middle cuneiform, which is basically
23     opening up the area of the fracture and

Page 36

1      reducing it, putting it in the proper
2      position and putting a screw in.
3  Q.  Was that done under a general anesthesia?
4  A.  Yes.
5  Q.  And was she hospitalized due to that
6      procedure?
7  A.  Yes.
8  Q.  How long did she stay in the hospital for
9      that?  How long do patients usually stay in
10     for something like that?
11 A.  I would say just overnight or a day or
12     two.  I honestly cannot recall if she
13     stayed one night or two.
14 Q.  Okay.  It is detailed in the hospital
15     records and I won't --
16 A.  I don't have that discharge summary again.
17     I'm sorry.
18 Q.  Okay.  Then did you follow her again after
19     that second surgery?
20 A.  I saw her on 2/5/07, which was five days
21     after the operation.
22 Q.  And at that time how was she doing?
23 A.  The -- As I read this dictation, she -- I

9 (Pages 33 to 36)

Page 37

1   checked the incision on the foot, which
2   looked fine.  I was also looking at both
3   tibias at the time and I was worried --
4   that anterior tibial wound is the area
5   where her open fracture was on her right
6   lower leg.  I was concerned that it was
7   looking concerning like it might become
8   infected or require further procedures.
9   Q.  All right, sir.  And is that one of the
10   risks with regard to the open fracture?
11   A.   That's one of the problems or potential
12   complications, yes.
13   Q.  And that's something that you pay
14   particular attention to?
15   A.   Yes.
16   Q.  You were concerned about it at that time;
17   is that right?
18   A.   Yes.
19   Q.  Now, at this point here, February the 5th,
20   2007 when she came back -- came to your
21   office for an office visit, what is her
22   condition?  Is she able to move about on
23   her own?

Page 38

1   A.   No.  She's not able to put weight on either
2   leg.  She's in splints and casts and so
3   forth to keep her legs still so the
4   fractures could heal.  So she's obviously
5   not ambulatory, but she's getting up in a
6   wheelchair.
7   Q.  And she's not able to get in the tub, take
8   a bath, take a shower, anything like that?
9   A.   No.
10   Q.  Would that be correct?
11       What about being able to go to the
12   bathroom?  She still has to use a bed pan
13   at that point?
14   A.   I would think that she was probably using a
15   bedside commode or something along those
16   lines.
17   Q.  All right.  Did you see her -- When did you
18   see her after the February 5th, '07 visit?
19   A.   Next visit was the 12th of February.
20   Q.  What did you find at that time?
21   A.   At that point her foot -- I noted her
22   incision on her foot looked okay.  We took
23   her sutures out and put her in a cast on

Page 39

1   that side.  The wound on her tibia was of
2   concern.  I noted that.  We basically were
3   at this point doing dressing changes I
4   would assume in that area and also were
5   addressing her left knee, which was the
6   tibial plateau fracture.
7   Q.  So at that point she's still in cast, still
8   not able to walk and you're just checking.
9   You have to give the bones time to heal; is
10   that right?
11   A.   That's correct.
12   Q.  Did you see her again on February the 28th?
13   A.   Yes.
14   Q.  And what did you find at that time?
15   A.   Well, the dictation says kidney wound.
16   Obviously that's a typo.  That was her --
17   I'm assuming that's the tibial wound.  At
18   this point her right leg where the tibia
19   fracture was I felt like the wound over
20   that, which is -- this is six weeks or so
21   after her -- or five weeks after the injury
22   approximately.  So that was looking
23   better.  But I was concerned about her

Page 40

1   tibial plateau fracture and that fragment
2   that we had discussed earlier in the left
3   leg looked like it was further displacing,
4   and I was concerned that we were going to
5   require some intervention there.
6   Q.  And that's that same fragment you were
7   talking about earlier; right?
8   A.   Right.
9   Q.  And you say she still can't put any
10   weight on -- she's still non weight
11   bearing; is that right?
12   A.   Non weight bearing on either leg.
13   Q.  Okay.  Were you prescribing pain medication
14   for her from the time you first saw her in
15   the hospital on up to some point?
16   A.   Yes.
17   Q.  What medications do you generally prescribe
18   for a patient like Ms. Wilker, or what did
19   you prescribe for her specifically?
20   A.   Originally I had her on Tylox, which is
21   Oxycodone, which is a narcotic pain
22   medicine, and later switched her to Lortab
23   10 and then 7.5 and later to Lortab 5.

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services                    January 17, 2008

Page 41

1  Q.  When you had -- The next office visit, when
2      did you see her then, Dr. Mattox?
3  A.  That would be 3/5/07.
4  Q.  All right.  You say she's six to seven
5      weeks out from her injury; is that right?
6  A.  Yes.
7  Q.  How was she doing at that time?
8  A.  I felt like her incisions or wounds looked
9      better.  I had taken her out of the cast on
10     the right leg and put her in a boot, which
11     is removable.  Her -- She was still
12     non weight bearing on both sides, and I
13     mentioned again that she was -- I was still
14     concerned about that fragment of the left
15     knee.  She was having trouble -- I started
16     her on some range of motion exercises
17     there, and I was going to see her again a
18     couple of weeks after that.
19 Q.  You noted in there she's having a little
20     popping in the knee --
21 A.  Uh-huh (positive response).
22 Q.  -- which makes me a little concerned about
23     the fragment I've been watching on x-ray.

Page 42

1      Popping in the knee, did that indicate some
2      involvement in the articular surface to
3      you?
4  A.  Right.  The fragment, as I mentioned
5      earlier, appeared to be behind the knee or
6      in a position in the knee that it wouldn't
7      be symptomatic or problematic.  If it's
8      popping and inhibiting her motion, then it
9      could be in a position where it was more in
10     the way or more of a problem.
11 Q.  Can popping in the knee like that, can that
12     be painful in addition to these fractures
13     that she had?
14 A.  Yes.
15 Q.  What did you recommend to her March 5th of
16     '07?
17 A.  We were going to continue with basically
18     the current management, treatment.
19 Q.  She's still non weight bearing at that
20     time; is that right?
21 A.  That's right.
22 Q.  Still on pain medications; is that right?
23 A.  That's correct.

Page 43

1  Q.  Then you saw her back in March 26th of '07;
2      is that right?
3  A.  Yes.
4  Q.  What did you find at that time?
5  A.  Well, her right foot and her right leg were
6      looking better.  Left knee is not really
7      improving to the point where I felt like we
8      needed to be.  It looked like it was --
9      that fragment had displaced and was
10     problematic, so I told her we should take
11     her back to surgery and remove that
12     fragment.  My plan was to open -- you know,
13     go in with the scope, which is an
14     instrument where we can use very small
15     incisions and either remove that fragment
16     or possibly fix it.  That says revision
17     ORF.  That would be revision open reduction
18     internal fixation.  But that's what we
19     scheduled her for.
20 Q.  So that's the fragment you've been watching
21     all along; is that right?
22 A.  That's right.
23 Q.  And at that point March 26th of '07 she's

Page 44

1      still non weight bearing on either side; is
2      that right?
3  A.  That's right.
4  Q.  And she's still taking pain medication; is
5      that right?
6  A.  That's right.
7          MR. HALL:  Let's take a break just
8      for a moment.
9          MR. ALLRED:  I beg your pardon?
10         MR. HALL:  I want to take a break
11     for a moment.  I want to
12     object to the leading nature
13     of the questions.  I'm trying
14     not to mess up your tape, but
15     you continue to ask leading
16     questions and I'm going to
17     object to that.  I don't want
18     to mess up your tape.  But,
19     Doctor, when he asks a
20     question, if you would give
21     some time for me to make my
22     objection to the form because
23     he's asking questions that

Page 45

1   suggest the answer rather than
2   asking you questions where you
3   answer them.  I want to make
4   my objection and then you
5   answer the question after --
6   after I have the time to make
7   my objection.
8   THE WITNESS:  So you're asking me
9   to hesitate between each
10  question?
11  MR. HALL:  Yes, sir.
12 Q.  Doctor, let me tell you, you don't need any
13  special instructions.
14  MR. ALLRED:  Go ahead and put this
15  down.
16  MR. HALL:  Well, I don't want to
17  have to talk over him.
18  MR. ALLRED:  Go ahead and --
19  MR. HALL:  I don't want both of us
20  talking at the same time.
21  MR. ALLRED:  Go ahead and put this
22  down.
23 Q.  You don't need any special instructions.

Page 46

1   You've given depositions before.  Judges
2   regularly allow leading questions in
3   medical depositions.  As you know, all I'm
4   doing is just asking questions out of what
5   you've written down in these records here.
6  A.  Well, we're reviewing the chart.  That's --
7  Q.  That's all we're doing.
8   MR. HALL:  And I don't have a
9   problem with that.  But the
10  way that the questions are
11  phrased they're leading and
12  suggestive and that's not
13  permitted and I just want time
14  to make my objection.  That's
15  really all I want and I'm
16  entitled to that.  And you
17  know --
18  MR. ALLRED:  I'll tell you what.
19  You can have a standing
20  objection to the form or the
21  leading or whatever you want
22  to of every question.
23  MR. HALL:  Okay.  I'll take that.

Page 47

1   I've got a standing
2   objection --
3   MR. ALLRED:  That's right.
4   MR. HALL:  -- from here on out and
5   there's no need for me to make
6   any objections.
7   MR. HALL:  There's no need for
8   you to interfere.
9   MR. HALL:  That also goes for the
10  entire deposition; is that
11  right?
12  MR. ALLRED:  That's right.
13  There's no need for you to
14  interfere with the deposition
15  any further --
16  MR. HALL:  For the record --
17  MR. ALLRED:  -- or try to
18  influence the witness's
19  testimony.
20  MR. HALL:  -- we have a
21  stipulation and an agreement
22  that I have a standing
23  objection as to the leading --

Page 48

1   MR..ALLRED:  That's right.
2   MR. HALL:  -- and the form of the
3   questions.
4   MR. ALLRED:  That's about three
5   times you've said that.
6   There's no need for you to --
7   MR. HALL:  I don't have to make
8   any objections.  I can take
9   them up with the judge.
10  MR. ALLRED:  That is correct.
11  MR. HALL:  And the fact that I'm
12  silent does not mean I'm not
13  objecting, because my
14  objection is noted for the
15  record to each question.
16  MR. ALLRED:  That is abundantly
17  clear.
18  MR. HALL:  Thank you.
19  MR. ALLRED:  And then you don't
20  have to try to indicate to the
21  witness that I'm doing
22  something wrong.  Now, let's
23  proceed.  We got that out of

Deposition of N. Tucker Mattox, M.D.                Wilker vs. US Services                January 17, 2008

Page 49

1      the way.
2  Q.  Okay.  You're down to --
3          MR. ALLRED:  Are we ready to go
4      back on?
5          VIDEOGRAPHER:  Yes, sir.
6          MR. ALLRED:  Are we?  Okay.
7          VIDEOGRAPHER:  We are on.
8          MR. ALLRED:  Have we been on the
9      whole time?
10         VIDEOGRAPHER:  Yes, sir.
11         MR. ALLRED:  Okay.  Good.
12 Q.  Now, Doctor, I think we were down to March
13     26th of '07.  You were talking about going
14     to do the procedure on the knee.  And then
15     when did you do that procedure?
16 A.  On 4/4 of '07.
17 Q.  And tell us; if you will, what you did and
18     where you did it and just explain that to
19     us, if you will.
20 A.  At Baptist South Hospital.  I took her to
21     surgery under general anesthetic.  She had
22     arthroscopy of the left knee, which was the
23     knee that she'd had the fracture that we've

Page 50

1      been discussing.  At that time basically
2      removed that loose fragment that I was
3      concerned about and also noted that she had
4      some chondromalacia, which is irregularity
5      or injury to the articular cartilage in the
6      knee, and I did debridement or smoothing
7      off of that area.
8  Q.  All right, sir.  Now, that would be the
9      third surgical procedure; is that right?
10 A.  Yes.
11 Q.  All right.  Now, what is chondromalacia?
12 A.  Chondromalacia is basically articular
13     cartilage that's either been injured or
14     diseased and it's no longer as thick as it
15     was or as smooth as it was.  It's irregular
16     or thinned articular cartilage.
17 Q.  What problems does that cause to the
18     patient when they have chondromalacia?
19 A.  Well, it's a precursor to arthritis, that
20     posttraumatic arthritis we discussed
21     earlier.
22 Q.  Does it cause pain to the patient?
23 A.  It can cause pain and popping, clicking,

Page 51

1      those type of symptoms.
2  Q.  In your opinion, was the popping or
3      clicking that Ms. Wilker had experienced,
4      was that due to the chondromalacia?
5  A.  I felt like it could be.  That's why I
6      addressed it.  Also could be that loose
7      fragment of bone and cartilage that we've
8      been discussing all along.
9  Q.  All right.  Up to this point that we're
10     talking about where you've done this third
11     surgery, were all of the conditions and the
12     injuries that you treated, were they
13     consistent with being involved in an
14     automobile and truck wreck?
15 A.  Yes.
16 Q.  And do you feel like the injuries that you
17     diagnosed and treated, that they were
18     caused by the automobile and truck wreck
19     that you were given as the history of the
20     injury?
21 A.  Yes.
22 Q.  And throughout the course of your treatment
23     of Ms. Wilker, were you ever given any

Page 52

1      history that caused any of these conditions
2      other than being in an automobile truck
3      wreck?
4  A.  No.
5  Q.  All right, sir.  Now, after the
6      chondromalacia procedure you did, when did
7      you next see Ms. Wilker, please, sir?
8  A.  I saw her on 4/11/07.
9  Q.  All right, sir.  Was that in the office?
10 A.  Yes.
11 Q.  And what did you find at that time?
12 A.  She -- At that point we had started her,
13     after the arthroscopy, on motion.  I felt
14     like her x-rays looked better and her
15     motion already looked better.  And I was
16     going to let her put some weight or start
17     gradually putting some weight on the left
18     leg.  And her right leg, which is the one
19     that had the foot problem and the tibia,
20     I'd let her gradually put some weight on
21     that as well.
22 Q.  Was she still in a cast at that point?
23 A.  She -- No.  She was in a boot, which is a

Deposition of N. Tucker Mattox, M.D.         .    Wilker vs. US Services                    January 17, 2008

|  | Page 53 |
|---|---|
| 1 | removable cast boot, which is something you |
| 2 | take on and off. |
| 3 | Q.  Is that kind of like that big black boot? |
| 4 | A.  Right. |
| 5 | Q.  Okay.  I think Dr. Hodurski calls it a |
| 6 | Darth Vader boot.  Have you used that term? |
| 7 | A.  Some people call it that. |
| 8 | Q.  Okay.  Does she have one for each leg at |
| 9 | that point, or do you remember? |
| 10 | A.  I do not recall.  I would think she just |
| 11 | had it on the right leg. |
| 12 | Q.  All right.  When did you next see |
| 13 | Ms. Wilker, Dr. Mattox? |
| 14 | A.  I saw her on 5/2/07. |
| 15 | Q.  And what did you find at that time? |
| 16 | A.  Her motion was improving at that point. |
| 17 | She was still lacking some extension as I |
| 18 | noted, which is straightening out of the |
| 19 | left leg.  Her right leg looked like it was |
| 20 | healing fine, as was her left foot and her |
| 21 | right foot.  I noted here she's to see |
| 22 | Lane -- that's Lane Blondheim -- who is the |
| 23 | physical therapist. |

|  | Page 55 |
|---|---|
| 1 | sometimes prescribed.  Usually I or the |
| 2 | therapist will decide that we need a little |
| 3 | extra help getting either full bend or |
| 4 | flexion or full extension, which is |
| 5 | straightening.  And it's a device that you |
| 6 | put on your leg that you tighten or adjust |
| 7 | that helps to pull the leg out straight. |
| 8 | Q.  When did you see Ms. Wilker again, |
| 9 | Dr. Mattox? |
| 10 | A.  I saw her on 5/23/07. |
| 11 | Q.  And what did you find at that visit? |
| 12 | A.  Well, at that point her right leg was |
| 13 | continuing to improve.  She was putting -- |
| 14 | She was full weight-bearing on her right |
| 15 | side.  I was still concerned about her left |
| 16 | knee or left leg.  She was lacking 10 |
| 17 | degrees of full extension and so that was a |
| 18 | major concern.  I did write at that day for |
| 19 | her to get a Dynasplint, which is a brand |
| 20 | name for a dynamic extension splint that we |
| 21 | just discussed, something that she would |
| 22 | put on a few hours a day to straighten the |
| 23 | leg out. |

|  | Page 54 |
|---|---|
| 1 | Q.  When you mention Lane in there, is that |
| 2 | Lane Blondheim? |
| 3 | A.  Yes. |
| 4 | Q.  Okay.  And while we're talking about the |
| 5 | physical therapist, we have the records on |
| 6 | it, which are part of your office notes. |
| 7 | But did you prescribe physical therapy for |
| 8 | Ms. Wilker? |
| 9 | A.  Yes. |
| 10 | Q.  And was that something that was necessary |
| 11 | for her treatment? |
| 12 | A.  Yes. |
| 13 | Q.  And was that caused by the motor vehicle |
| 14 | and truck accident in your opinion, the |
| 15 | need for the physical therapy? |
| 16 | A.  The therapy was needed to help her get over |
| 17 | the injuries she sustained in the accident. |
| 18 | Q.  All right, sir.  And down in the bottom |
| 19 | sentence there you say at this -- at that |
| 20 | time consider a dynamic extension splint of |
| 21 | the left knee if she is not all the way |
| 22 | extended.  What does that mean, Dr. Mattox? |
| 23 | A.  There are devices, splints that are |

|  | Page 56 |
|---|---|
| 1 | Q.  Was she on crutches that day? |
| 2 | A.  She should be at that point still on |
| 3 | crutches -- |
| 4 | Q.  Fourth line down. |
| 5 | A.  -- with regards to the left leg. |
| 6 | Q.  Fourth line down. |
| 7 | A.  Right.  Yes. |
| 8 | Q.  There was some mention in your records |
| 9 | about extension and flexion.  And so we can |
| 10 | get those terms straight in there, tell us |
| 11 | what extension is with regard to the leg |
| 12 | and what flexion is. |
| 13 | A.  Extension is straightening of the knee or |
| 14 | leg. |
| 15 | Q.  Straighten it out? |
| 16 | A.  In this situation getting the knee |
| 17 | straight.  Flexion is bending -- or flexion |
| 18 | is to pull the knee back.  So if this is |
| 19 | the knee, this is extension, this is |
| 20 | flexion (indicating). |
| 21 | Q.  All right, sir.  Did you see her after May |
| 22 | the 30 -- May 23rd of '07? |
| 23 | A.  I saw her on 6/13/07. |

Page 57

1  Q.  And what did you find at that time?
2  A.  At that time extension of her knee was
3      still a concern of mine and hers.  So we
4      were continuing with the extension, the
5      dynamic extension splint, and we progressed
6      her to weight-bearing as tolerated on the
7      left leg, which is allowing her to put more
8      and more weight on the left leg.
9  Q.  Was she still -- Did you still have a
10     prescription for pain medication for her at
11     that time?
12 A.  She received pain medicine from me at most
13     visits through the end of my treatment.
14     So, yes, I would say at this point she's
15     still taking pain --
16 Q.  While you're looking at the prescription
17     medicine, what do your records show the
18     time that she received prescriptions for
19     this pain medication?  When was the last
20     prescription for it?
21 A.  Last prescription I wrote for pain medicine
22     for her was on August 8th of '07.
23 Q.  And in your opinion was that pain

Page 58

1      medication necessary to control her pain
2      because of her injuries?
3  A.  Yes.
4  Q.  And is it your opinion that her injuries
5      were caused by the motor vehicle and truck
6      wreck?
7  A.  Yes.
8  Q.  All right, sir.  Did you have some other
9      office visits where you saw Ms. Wilker?
10 A.  I saw her on 7/11/07 and 8/8/07.
11 Q.  All right, sir.  What about the 7/11 visit,
12     what did you find at that time?
13 A.  She was improved on the straightening or
14     extension but still lacked a few degrees of
15     extension.  She was not putting all her
16     weight on her left leg, but she was working
17     in that direct -- she had been working on
18     doing that.  The fractures were healing,
19     all the ones noted here, her foot and her
20     tibia.  So I told her at that point just
21     to -- we would stop doing the formal
22     therapy, let her do the dynamic extension
23     splint and work on strengthening herself.

Page 59

1  Q.  All right, sir.  And you had -- When's the
2      last time you saw her?  Was that the August
3      8th visit?
4  A.  August 8th, '07 apparently was the last
5      visit.
6  Q.  All right.  And that would be seven months
7      just about from her injury?
8  A.  Yes.
9  Q.  What did you find at that time, Dr. Mattox?
10 A.  At that point she -- on my measurement at
11     that time she still lacked 10 degrees of
12     full extension.  She had nine degrees of
13     flexion.  She was still having a little bit
14     of pain requiring her to use a crutch when
15     she first started getting up and walking.
16     At that point I noted that we were going to
17     use the Dynasplint or the extension splint
18     for an additional month.  Requested that
19     she ride the stationary bike to help with
20     strengthening and improvement and I was to
21     check her back in a month.
22 Q.  And that was the last time you saw her; is
23     that right?

Page 60

1  A.  That's right.
2  Q.  All right.  In your opinion, Dr. Mattox,
3      how long was Wendy Wilker -- what period of
4      time was she unable to work at her job?
5  A.  I can't recall at what point -- sometimes
6      I'll have a work slip.  She was unable to
7      work during the majority of that time that
8      I was treating her.  Looking to see if I
9      had a work slip on the last one, but --
10 Q.  While you're looking for that, I notice you
11     did write a letter on January 31st about
12     her need for an ambulance.  This is part of
13     the records that's in your office file
14     there.  And then she would need an
15     ambulance again to be transported for one
16     of the additional surgeries.
17 A.  Yes.  At this point she was -- they were
18     having trouble getting her into a car and
19     needed some assistance with that, so we try
20     to arrange for an ambulance for transport.
21 Q.  Rather than put you to the task of looking
22     for that --
23 A.  Well, I just don't think I'm going to be

Page 61

1    able to answer you specifically on that.  I
2    know that she was unable to work for an
3    extended period of time afterwards.
4    Possibly as long as six, seven months, but
5    I honestly do not recall.
6    Q.   Was Ms. Wilker a compliant patient, meaning
7    did she do what you suggested and
8    recommended that she do --
9    A.   Yes.
10   Q.   -- treatment-wise?
11        And did she try to get well with her
12   treatments and with physical therapy?
13   A.   She was compliant and in my opinion was
14   working to get well, yes.
15   Q.   All right.  Have you addressed the issue of
16   what kind of disability from an orthopedic
17   standpoint she would have in the way of a
18   permanent disability with the fractures
19   that she had and --
20   A.   No.  I've not done --
21   Q.   -- the treatment that she has?
22   A.   -- any type of disability rating.
23   Q.   All right.  And is there -- With regard to

Page 62

1    what kind of problem she's having with her
2    knees or with the injuries now, when you
3    last saw her and the complaints she was
4    having, did you have an opinion whether she
5    was going to need a knee replacement or
6    anything like that in the future?
7    A.   Well, I was concerned about the -- or I
8    would be concerned about the left knee
9    injury, the fact that it was an
10   intra-articular fracture and comminuted and
11   she'd had the problems that she could have
12   posttraumatic arthritis down the road,
13   which is -- don't know if that would be in
14   a few years or 20 to 30 years.  There's no
15   way to know for sure.  There's a
16   possibility she could need further
17   procedures if she does develop arthritis,
18   but speculation at this point just how bad
19   it would be.
20   Q.   Okay.  Do you do knee replacements, or do
21   you refer patients that need them to other
22   doctors?
23   A.   I do knee replacements, yes.

Page 63

1    Q.   All right.  I believe she's been to see a
2    Dr. Terry over at the Hughston Clinic in
3    Columbus.  Do you know of him?
4    A.   I don't know him personally, no.
5    Q.   We have his deposition scheduled.  But I
6    understand that his opinion is she's going
7    to need a knee replacement.  Would that be
8    consistent with your findings the last time
9    that you saw her?
10        MR. HALL:  I'm going to object not
11             only for the grounds that I
12             have stated but for other
13             additional grounds to that
14             question.
15   A.   Well, as I said that -- whether or not she
16   needs a knee replacement at this point.
17   She could possibly later.  I don't have --
18   The way to determine that would be to
19   follow x-rays and see down the road how
20   that articular surface looks.  As I said,
21   there's a possibility she could.  At this
22   point, since I haven't seen her in six
23   months, I can't --

Page 64

1    Q.   Would you defer to Dr. Terry since he's
2    seeing her currently on that issue?
3    A.   Well, that would be his opinion.  Again, I
4    would have to look at x-rays and see.
5    She -- Depends on what the x-rays look like
6    and the kind of pain she's having whether
7    she would be best served by a knee
8    replacement.
9    Q.   Is that what makes the determination on
10   whether the knee replacement is needed what
11   the x-rays look like and then what kind of
12   pain and discomfort it's causing the
13   patient?
14   A.   Yes.
15   Q.   Okay.  Now, with regard to the opinions
16   that you've given concerning Wendy Wilker,
17   have all of your opinions been to a
18   reasonable degree of medical certainty?
19   A.   Yes.
20        (Plaintiff's Exhibit 2 was marked
21             for identification.)
22   Q.   We have -- Some of the administrative
23   things we have to do in a court proceeding

Page 65

```
 1    includes the matter of your charges. And
 2    let me show you what's marked as Exhibit
 3    2. That one -- Let's see. This 2 I think
 4    is your charge.
 5  A. Okay.
 6  Q. And I have totaled that up, and if I have
 7    done the adding correctly, it is $16,993 is
 8    your bill. And then you have another
 9    printout there, which we need to make an
10    exhibit as well.
11  A. This is my print-off of the charges that my
12    office did for this deposition.
13       (Plaintiff's Exhibit 2-A was marked
14        for identification.)
15  Q. Okay. Why don't we make that 2-A. Exhibit
16    2 is the one I just asked you about. And
17    if we can make 2-A the printout that you're
18    talking about. And that is the -- Well, I
19    did have the charges wrong. Exhibit 2
20    should be $17,236. And then your office
21    accepted a different amount from BlueCross;
22    is that right?
23  A. Yes.
```

Page 66

```
 1  Q. And what was that amount?
 2  A. Looks like 6,648.
 3  Q. And the charges that you charge for your
 4    work and the charges in your office, are
 5    they reasonable and customary charges in
 6    the medical community in Montgomery?
 7  A. Yes.
 8       (Plaintiff's Exhibit 3 was marked
 9        for identification.)
10  Q. And in addition to that, let me show you
11    Exhibit 3, which is the Baptist -- a
12    Baptist South bill, which on the last sheet
13    back there I think it's $58,060.64. If you
14    could look through that. The dates on it
15    say 1/18/07 to 1/25/07. And are those
16    charges -- Same question. Are those
17    charges reasonable in the medical community
18    in Montgomery?
19       MR. HALL: Objection.
20  A. As far as I know.
21       (Plaintiff's Exhibit 4 was marked
22        for identification.)
23  Q. All right, sir. And I'll show you Exhibit
```

Page 67

```
 1    4, which is another bill to Baptist South.
 2    And the total on it is 9,884.55. And the
 3    same question there. Is that -- Are those
 4    charges reasonable in the medical community
 5    in Montgomery?
 6       MR. HALL: Objection.
 7  A. Yes.
 8       (Plaintiff's Exhibit 5 was marked
 9        for identification.)
10  Q. And the same thing with Plaintiff's Exhibit
11    5, Baptist South bill there. I think it's
12    12,995.15. Are those charges reasonable in
13    the medical community in Montgomery?
14       MR. HALL: Same objection.
15  A. Yes.
16  Q. Now, was -- with regard to all of the
17    medical bill exhibits, were those -- the
18    treatment that's reflected on there and all
19    the treatment you did, in your opinion, was
20    that treatment made necessary because of
21    being in the motor vehicle and truck wreck?
22  A. Her -- Right. Her treatment was -- All the
23    treatments that I did and all these times
```

Page 68

```
 1    she was in the hospital were because of the
 2    motor vehicle accident in January.
 3  Q. All right, sir. In other words, you didn't
 4    treat her for any other conditions other
 5    than the injuries in this car and truck
 6    wreck; is that right?
 7  A. I did not.
 8  Q. All right, sir.
 9       VIDEOGRAPHER: Mr. Allred, I need
10        to change tapes, please.
11       MR. ALLRED: Sure. Go ahead.
12       VIDEOGRAPHER: We're going off the
13        record. This is the end of
14        tape one.
15       (Brief pause.)
16       VIDEOGRAPHER: We're back on the
17        record. This is the beginning
18        of tape two.
19       MR. ALLRED: If we haven't already
20        done so, the plaintiff moves
21        to introduce Exhibits A, 1, 2,
22        2-A, 3, 4 and 5. And at this
23        time that's all the questions
```

Page 69

1  I have, Dr. Mattox. And thank
2  you very much for your time.
3  MR. HALL: Before I get started, I
4  want to just put on the record
5  I object to introducing all of
6  those exhibits. Some I don't
7  object to, but we'll get to
8  that before trial.
9  All right. I'm ready.
10  EXAMINATION
11  BY MR. HALL:
12  Q. Dr. Mattox, you performed what is known as
13  open reduction internal fixation procedures
14  on Ms. Wilker; is that correct?
15  A. Yes.
16  Q. And is that a procedure that you have
17  performed many times?
18  A. Yes.
19  Q. Is that a routine procedure for you in your
20  practice of orthopedic surgery?
21  A. It's very common for people to be injured
22  in accidents, and that's the typical
23  treatment for it, yes.

Page 70

1  Q. And you've performed that procedure
2  hundreds or thousands of times?
3  A. I'd say hundreds of times.
4  Q. It's not something that you're not
5  acquainted with?
6  A. No. It's a very common procedure.
7  Q. And other physicians in your group also
8  perform those types of procedures?
9  A. Yes.
10  Q. Would be what's called a routine procedure;
11  isn't that true?
12  A. Well, the -- I guess the tibial plateau
13  fracture would be a little more serious a
14  type of fracture. But it's not an uncommon
15  procedure, no.
16  Q. Right. Yeah. And that's what -- What I'm
17  asking is that the procedure is not
18  uncommon; correct?
19  A. That's -- Right. If you treat trauma
20  patients, orthopedic surgeons treating
21  trauma patients would have to perform that
22  operation.
23  Q. You had been asked questions about the

Page 71

1  risks associated with the surgery such as
2  infection and there were other things.
3  A. Yes.
4  Q. None of those appeared in your treatment of
5  Ms. Wilker, did they?
6  A. No.
7  Q. She did not have complications resulting
8  from the surgical procedures -- or the
9  risks associated with the surgical
10  procedures I should say?
11  A. Well, the -- I guess if you're discussing
12  the tibia fracture, which was the open
13  fracture, the one that was the 3A open
14  tibia and prior to surgery I said she was
15  at risk for infection or bone grafting or
16  skin grafting. She did -- She healed that
17  uneventfully. She did not require any
18  further treatment of that, so no. She did
19  on the left knee. I guess one potential
20  complication that I noted that it was a
21  comminuted fracture and might require
22  further procedures and she did require by
23  me an arthroscopy later as we discussed to

Page 72

1  take out a fragment. That's, I guess, what
2  I was -- One of the things I was discussing
3  prior to that procedure is there's a risk
4  of that, and it turned out she did require
5  that. And she did not regain her full
6  motion at least while I was treating her,
7  so that would be one potential complication
8  of the left knee problem.
9  Q. Now, as far as her range of motion, I think
10  you said it was within 10 degrees when you
11  last saw her?
12  A. In August of '07, which was the last visit
13  I saw her, she lacked 10 degrees of full
14  extension and 90 degrees of flexion.
15  Q. And as far as her other fractures, they had
16  healed to your satisfaction; is that right?
17  A. The fractures that I had been treating her
18  for had healed. The only real issue at
19  that last visit was her motion.
20  Q. And I think you were of the opinion that
21  they healed nicely, the fractures; is that
22  right?
23  A. They healed, yes.

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services          January 17, 2008

Page 73

1  Q.  Were you satisfied with the results that
2      you had obtained in your treatment of
3      Ms. Wilker?
4  A.  Her right leg, right foot, left foot all --
5      I was satisfied with. No problem. Her
6      left knee I was concerned that she, number
7      one, had not gotten her full motion back.
8      Last 10 degrees -- 90 degrees of flexion,
9      both of those I would like to have her at
10     better motion on both, both the
11     straightening and the bending. And I was
12     concerned about that portion of the tibial
13     plateau, which is at the knee. I was
14     concerned about that area, an area of
15     posttraumatic arthritis later.
16 Q.  When you last saw Ms. Wilker, you did not
17     see the need for any additional surgeries
18     in the future; isn't that true?
19 A.  I did not discuss with her any further
20     surgical treatment, no.
21 Q.  You had -- It looks like Ms. Wilker had
22     insurance with BlueCross BlueShield and
23     they paid $6,648 for the medical treatment

Page 74

1      which you provided to her; is that correct?
2  A.  Yes.
3  Q.  And then do you know how much they paid the
4      hospital?
5  A.  I have no idea.
6  Q.  And do you -- You were asked questions
7      about the hospital charges. You do not
8      work for the hospital, do you?
9  A.  No.
10 Q.  And are you -- You're not the one that
11     negotiates or determines what charges or
12     fees will be accepted based on the health
13     care services provided by the hospital?
14 A.  No.
15 Q.  And you do not work in the department --
16     the billing department of the hospital?
17 A.  No.
18 Q.  Do you know who the person is in the
19     hospital that is in charge of the billing
20     and determining what amounts they feel are
21     reasonable to accept as payment for
22     services they provide?
23 A.  No.

Page 75

1  Q.  But that's not you?
2  A.  That's not me.
3  Q.  Was Ms. Wilker continuing to improve when
4      you last saw her?
5  A.  She was -- At that point she still, as I
6      mentioned, had some motion issues that had
7      not fully resolved. But I felt like she
8      was having some slow gradual improvement,
9      yes.
10 Q.  Are you aware that she ambulates without
11     any assistance?
12 A.  Well, I haven't seen her since August of
13     '07.
14 Q.  Okay. You were talking about the fact that
15     there's a possibility that she could need
16     additional procedure. Could be 20 years
17     out. Could be 30 years out. In fact, it
18     could be that she never needs one; isn't
19     that true?
20 A.  It's possible that she would not require
21     any further surgery.
22 Q.  And that's based on your treatment of her
23     and your observation of her and her

Page 76

1      improvement during the entire time that she
2      was under your care, isn't it?
3  A.  Well, as I spoke earlier, none of us have a
4      crystal ball. The type of injury she had,
5      which was a severe fracture of the tibia,
6      left knee, that does put her at much higher
7      risk -- much higher risk than if she had
8      not had an accident. So I can't predict
9      whether she's going to have pain and
10     problems and worsening arthritis on x-ray.
11     I would suspect that over time she will
12     have some of that, but I can't guarantee
13     that she will or she won't.
14 Q.  And under your care you did not recommend
15     any additional procedures or surgical
16     intervention?
17 A.  I did not.
18         MR. HALL: That's all I have.
19              EXAMINATION
20 BY MR. ALLRED:
21 Q.  Dr. Mattox, can you say based on when you
22     last saw her since she had a fracture in
23     the articular surface in that knee, can you

Page 77

1  say it's more likely than not that she's
2  going to continue to have problems with it?
3  A.  Well, again, the type of fracture that she
4  had in the joint and her weight-bearing
5  portion of the joint, then she's at much
6  higher risk, as I said, of problems later.
7  Although there's no way to predict whether
8  that's going to be a real symptomatic
9  problem in the near future or later on in
10  her life.
11  Q.  Is she more likely to have problems than a
12  person who has not had that kind of
13  fracture?
14  A.  Yes.  Yes.
15  Q.  And you were asked some questions and you
16  gave some answers while ago to the
17  defendant's lawyer.  Has anything that
18  you've said in response to his questions
19  changed your opinions regarding your
20  diagnosis and treatment of Wendy Wilker?
21  A.  No.
22      MR. ALLRED:  All right, sir.
23      Thank you, sir.

Page 78

1          EXAMINATION
2  BY MR. HALL:
3  Q.  Doctor, you're not saying it's likely that
4  she is going to have a procedure in the
5  future.  You're only saying it's more
6  likely than had she not been injured in the
7  accident; is that right?
8  A.  Could you say it one more -- ask the
9  question one more time?
10  Q.  Your testimony is not that Ms. Wilker is
11  likely to have some surgical procedure,
12  because you've said you don't have a
13  crystal ball and there's no way to tell.
14  A.  Right.  I'm saying the type of injury she
15  had and seeing what her knee looked like
16  looking at it through the scope and
17  following her in the period that I have,
18  she has got an injury where she's at much
19  higher risk for the problem than if she
20  hadn't had an injury or somebody that had
21  not had an injury.
22  Q.  But you're not saying it's likely that she
23  would have to have a procedure; just more

Page 79

1  likely or more --
2  A.  She's at much higher risk for needing
3  another procedure done.
4  Q.  Right.  Meaning higher risk?
5  A.  Higher risk.
6      MR. HALL:  That's all I have.
7      Thank you.
8      MR. ALLRED:  All right.  Thank
9  you, sir.
10  (Deposition was concluded at
11  approximately 1:15 p.m.)
12
13
14  * * * * * * * * * * * * *
15  FURTHER DEPONENT SAITH NOT
16  * * * * * * * * * * * * *
17
18
19
20
21
22
23

Page 80

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  MONTGOMERY COUNTY:
4      I, Lyn Daugherty, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, do hereby certify that I reported the
7  deposition of:
8      N. TUCKER MATTOX, M.D.
9  who was duly sworn by me to speak the truth, the
10  whole truth and nothing but the truth, in the
11  matter of:
12      WENDY WILKER and MICHAEL WILKER,
13      Plaintiffs,
14      vs.
15      US SERVICES, LLC; WILLIE MURRAY
16      ROBINSON, et al.,
17      Defendants.
18      IN THE UNITED STATES DISTRICT COURT
19      FOR THE MIDDLE DISTRICT OF ALABAMA
20      NORTHERN DIVISION
21      Civil Action No. 2:07-cv-00232-MEF
22  on Thursday, January 17th, 2008.
23      The foregoing 78 computer-printed pages

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services                    January 17, 2008

Page 81

1   contain a true and correct transcript of the
2   examination of said witness by counsel for the
3   parties set out herein.  The reading and signing is
4   hereby waived.
5        I further certify that I am neither of kin
6   nor of counsel to the parties to said cause nor in
7   any manner interested in the results thereof.
8        This 30th day of January 2008.
9
10
11
        _____
        Lyn Daugherty, ACCR #66
12      Expiration Date:  9-30-2008
        Certified Court Reporter
13      And Commissioner for the
        State of Alabama at Large
14
15
16
17
18
19
20
21
22
23

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services          January 17, 2008

Page 1

**A**

able 37:22 38:1,7,11
    39:8 61:1
about 8:14 9:4 11:2
    18:8,20 20:2,6 22:13
    23:3,13 24:4,7 26:6
    26:15 27:11,20 30:15
    33:13 37:16,22 38:11
    39:23 40:7 41:14,22
    48:4 49:13 50:3
    51:10 54:4 55:15
    56:9 58:11 59:7
    60:11 62:7,8 65:16
    65:18 70:23 73:12,14
    74:7 75:14
above 16:8
Absolutely 10:22
abundantly 48:16
accept 74:21
accepted 65:21 74:12
accident 11:13 17:18
    17:20 33:18 54:14,17
    68:2 76:8 78:7
accidents 69:22
accomplished 8:2
according 29:17
ACCR 1:16 81:11
accredited 9:11
acquainted 70:5
Action 1:7 80:21
Actually 7:17
adding 65:7
addition 25:21 42:12
    66:10
additional 59:18 60:16
    63:13 73:17 75:16
    76:15
address 7:13
addressed 31:3 33:21
    51:6 61:15
addressing 12:9,14
    22:8 39:5
adjust 55:6
administrative 64:22
adults 21:6,8
after 6:13 11:12 16:20
    28:21,23 30:17 33:18
    36:18,21 38:18 39:21
    39:21 41:18 45:5,6
    52:5,13 56:21
afternoon 6:18
afterwards 61:3
again 36:16,18 39:12
    41:13,17 55:8 60:15
    64:3 77:3
against 6:22
ago 9:1,2 31:15 77:16
agreeable 7:3

agreed 4:2,16,23
agreement 1:15 47:21
ahead 35:20 45:14,18
    45:21 68:11
al 1:9 5:11 80:16
Alabama 1:2,17,20 2:6
    2:11 4:8 5:15,20 8:18
    10:5 80:2,5,19 81:13
allow 46:2
allowing 57:7
Allred 2:4,4,18,20 6:2
    6:2,17,19 44:9 45:14
    45:18,21 46:18 47:3
    47:7,12,17 48:1,4,10
    48:16,19 49:3,6,8,11
    68:9,11,19 76:20
    77:22 79:8
almost 9:1
along 28:20 38:15
    43:21 51:8
already 52:15 68:19
Although 77:7
ambulance 11:21 60:12
    60:15,20
ambulates 75:10
ambulatory 38:5
amount 3:7,9,11 27:6
    65:21 66:1
amounts 74:20
anesthesia 17:6 18:5,7
    36:3
anesthesiologist 17:12
    17:14
anesthetic 49:21
ankle 14:6 23:15
another 65:8 67:1 79:3
answer 45:1,3,5 61:1
answers 77:16
anterior 37:4
antibiotics 29:11
anything 38:8 62:6
    77:17
apart 26:21
apparently 59:4
APPEARANCES 2:1
appeared 42:5 71:4
approached 22:5
approximately 1:21
    39:22 79:11
area 26:9,11,13 34:10
    35:23 37:4 39:4 50:7
    73:14,14
around 21:18
arrange 60:20
arrived 16:15 19:4
arthritic 10:2
arthritis 24:14,18,19
    24:20 25:5,23 50:19
    50:20 62:12,17 73:15

76:10
arthroscopy 49:22
    52:13 71:23
articular 22:9 24:23
    25:2,10 27:3,6,10,14
    27:18 42:2 50:5,12
    50:16 63:20 76:23
asked 65:16 70:23 74:6
    77:15
asking 44:23 45:2,8
    46:4 70:17
asks 44:19
assess 34:10
assessment 25:22
assistance 60:19 75:11
assistant 17:9,10
associated 24:21 71:1,9
assume 16:13 29:9 39:4
assuming 39:17
attention 37:14
Attorneys 2:5,10
Auburn 8:16
August 57:22 59:2,4
    72:12 75:12
automobile 17:17
    51:14,18 52:2
avoid 22:20
aware 75:10

**B**

B 14:19
back 18:15 19:21 31:2
    32:6 35:9 37:20 43:1
    43:11 49:4 56:18
    59:21 66:13 68:16
    73:7
bad 35:8 62:18
ball 76:4 78:13
Baptist 3:7,9,10,11
    10:18 11:6,12,15
    12:1 29:17 34:12
    35:16,17 49:20 66:11
    66:12 67:1,11
based 9:14 74:12 75:22
    76:21
basically 12:22 26:19
    35:22 39:2 42:17
    50:1,12
Bates 13:12 30:9
bath 38:8
bathroom 38:12
bearing 33:5,9 40:11
    40:12 41:12 42:19
    44:1
become 37:7
bed 38:12
bedside 38:15
before 1:16 4:6 26:2
    28:20 46:1 69:3,8

beg 44:9
beginning 68:17
behalf 6:20
behind 31:10 42:5
being 11:12 17:17 24:7
    35:5 38:11 51:13
    52:2 67:21
believe 7:5 26:3 29:13
    63:1
below 12:12
bend 55:3
bending 56:17 73:11
best 64:7
better 19:17 33:19
    39:23 41:9 43:6
    52:14,15 73:10
between 4:3,17 5:1
    23:14 45:9
bi 15:7
Bicondylar 15:9,11
big 23:1 53:3
bike 59:19
bill 3:5,6,7,9,10,11
    29:17,18 65:8 66:12
    67:1,11,17
billing 74:16,19
Birmingham 2:11 8:17
bit 59:13
black 53:3
Blondheim 53:22 54:2
blood 21:8
BlueCross 65:21 73:22
BlueShield 73:22
board 9:6,9,17
boards 8:21
beat 74:7
BOLVIG 2:9
bone 9:22 10:2 12:17
    14:5,10,12,17,23
    15:17 18:10,11,16,17
    19:14,19 20:13,16,20
    20:23 21:1,4,6,9,11
    23:12,17,19 25:12,13
    26:12 27:4,13,22
    28:12 35:5 51:7
    71:15
bones 14:6,8 20:14
    23:4,9 35:1 39:9
booked 26:17,18
boot 41:10 52:23 53:1
    53:3,6
both 26:5 31:1 33:7
    35:3 37:2 41:12
    45:19 73:9,10,10
bottom 15:20 30:10
    54:18
Boulevard 1:19
Box 2:6
brand 55:19
break 44:7,10

Brief 10:23 68:15
briefly 8:11 9:20
broke 14:16
broken 13:1 15:23 24:1
    28:2 31:9 32:1,17
    35:1
brought 11:20
building 8:1

**C**

C 14:19
call 12:5 53:7
called 70:10
calls 53:5
came 18:10 19:5 20:11
    30:17 37:20,20
car 28:2 60:18 68:5
cardiovascular 8:1
care 10:1 17:13 74:13
    76:2,14
carefully 27:23
cartilage 25:3,4,10,11
    27:14 50:5,13,16
    51:7
case 4:18,20 5:12 6:7
    6:21 7:2
cases 9:14
cast 13:3 38:23 39:7
    41:9 52:22 53:1
casts 38:2
cause 25:8 50:17,22,23
    81:6
caused 51:18 52:1
    54:13 58:5
causes 25:16
causing 64:12
cells 21:8
Center 10:18 11:6
certainty 64:18
CERTIFICATE 80:1
certification 9:9
certified 1:16 4:7 9:7
    9:17 80:4 81:12
certify 80:6 81:5
cetera 31:5
change 68:10
changed 77:19
changes 39:3
charge 65:4 66:3 74:19
charges 65:1,11,19.
    66:3,4,5,16,17 67:4
    67:12 74:7,11
chart 29:9 46:6
Chattanooga 8:20
check 59:21
checked 37:1
checking 39:8
chondromalacia 50:4
    50:11,12,18 51:4

Deposition of N. Tucker Mattox, M.D.    Wilker vs. US Services    January 17, 2008

Page 2

| | | | | |
|---|---|---|---|---|
| 52:6 | contamination 27:22 | defendant's 77:17 | doctor 11:15,23 16:17 | entire 47:10 76:1 |
| Civil 1:7 4:5 80:21 | 28:5,10 | defer 64:1 | 44:19 45:12 49:12 | entitled 46:16 |
| clean 18:13 | continue 42:17 44:15 | deficient 25:3 | 78:3 | ER 11:15 |
| cleaned 18:9 | 77:2 | degree 19:1 64:18 | doctors 12:4 62:22 | especially 18:12 |
| clear 48:17 | continuing 55:13 57:4 | degrees 55:17 58:14 | documents 30:12 | et 1:9 5:11 31:4 80:16 |
| clicking 50:23 51:3 | 75:3 | 59:11,12 72:10,13,14 | doing 36:22 39:3 41:7 | evaluated 11:14 16:17 |
| Clinic 63:2 | control 58:1 | 73:8,8 | 46:4,7 48:21 58:18 | ever 51:23 |
| closed 15:7 | copies 30:11 | demonstrate 19:1 | 58:21 | every 46:22 |
| Columbus 63:3 | copy 3:4 8:12 13:8,14 | department 74:15,16 | done 13:5 36:3 51:10 | evidence 4:13 28:13 |
| com 24:8 | corner 7:23 | Depends 64:5 | 61:20 65:7 68:20 | exactly 29:6 |
| come 11:17 28:12 | correct 14:17 15:15 | DEPONENT 79:15 | 79:3 | examination 2:16 6:16 |
| comes 15:20 18:11 | 17:11 28:7 38:10 | deposition 1:14 4:4,6 | down 7:21 12:17 14:1 | 9:13,14 13:6 69:10 |
| 28:11 | 39:11 42:23 48:10 | 4:13,18 5:2,6 6:20 | 18:16 20:13,16 21:1 | 76:19 78:1 81:2 |
| commencing 1:21 | 69:14 70:18 74:1 | 7:1,8,9 47:10,14 63:5 | 21:10,12,15,19 25:5 | examining 18:1 |
| comminuted 23:23 | 81:1 | 65:12 79:10 80:7 | 26:16,16,23 27:20,21 | excuse 13:2 17:15 |
| 24:1,3,9,15 26:23 | correctly 65:7 | depositions 46:1,3 | 30:9 33:12 45:15,22 | 35:20 |
| 27:6,10,17 32:16 | counsel 4:3,17 5:22 | describe 35:18 | 46:5 49:2,12 54:18 | exercises 41:16 |
| 62:10 71:21 | 81:2,6 | described 31:21 33:22 | 56:4,6 62:12 63:19 | exhibit 3:1 8:9,13 |
| comminution 31:22 | COUNTY 80:3 | 34:8 | Dr 3:4 5:6 6:18 8:6,7 | 13:15,19 64:20 65:2 |
| commission 4:9 | couple 19:3 21:2 41:18 | describing 26:19 31:13 | 10:11 18:6,20 20:21 | 65:10,13,15,19 66:8 |
| Commissioner 1:17 4:8 | course 10:5,10 18:21 | detailed 36:14 | 41:2 53:5,13 54:22 | 66:11,21,23 67:8,10 |
| 80:5 81:13 | 29:3 30:15 33:6 | details 22:3 | 55:9 59:9 60:2 63:2 | exhibits 67:17 68:21 |
| commode 38:15 | 51:22 | determination 64:9 | 64:1 69:1,12 76:21 | 69:6 |
| common 69:21 70:6 | court 1:1,16 5:14 6:8 | determine 63:18 | dressing 39:3 | experience 8:15 |
| community 66:6,17 | 6:21 7:6 64:23 80:18 | determines 74:11 | dressings 30:23 | experienced 51:3 |
| 67:4,13 | 81:12 | determining 74:20 | drill 20:22 | Expiration 81:12 |
| company 6:22 | cover 14:23 | develop 62:17 | drive 2:5 7:17 21:12,14 | explain 9:7 16:22 18:5 |
| complaint 11:9 | coverage 14:22 | device 21:13 55:5 | driver 6:23 | 49:18 |
| complaints 62:3 | crutch 59:14 | devices 54:23 | due 36:5 51:4 | extend 16:2 |
| complete 9:11 14:23 | crutches 56:1,3 | diagnose 13:4 | duly 6:13 80:9 | extended 33:10 54:22 |
| completed 8:20 | crystal 76:4 78:13 | diagnosed 15:1 17:16 | during 10:10 32:2 60:7 | 61:3 |
| compliant 61:6,13 | CT 34:9,13,15,16,21,22 | 51:17 | 76:1 | extension 53:17 54:20 |
| complication 71:20 | cuneiform 34:23 35:22 | diagnoses 16:10 | dynamic 54:20 55:20 | 55:4,17,20 56:9,11 |
| 72:7 | current 42:18 | diagnosis 14:2 15:6 | 57:5 58:22 | 56:13,19 57:2,4,5 |
| complications 23:10 | currently 64:2 | 16:4,21 18:3 34:19 | Dynasplint 55:19 59:17 | 58:14,15,22 59:12,17 |
| 37:12 71:7 | Curriculum 3:3 | 77:20 | | 72:14 |
| Composite 13:15 | cushioning 25:12 | dictation 32:5 36:23 | **E** | extra 55:3 |
| compound 12:13 23:16 | customary 66:5 | 39:15 | E 2:4,4 | |
| computer-printed | CV 8:12 | different 65:21 | each 45:9 48:15 53:8 | **F** |
| 80:23 | | direct 58:17 | earlier 19:10 40:2,7 | fabric 28:18 |
| concern 23:1 39:2 | **D** | dirt 28:13,18 | 42:5 50:21 76:3 | fact 14:21 24:15 34:9 |
| 55:18 57:3 | D 22:16 | disability 61:16,18,22 | East 1:19 | 48:11 62:9 75:14,17 |
| concerned 34:5 37:6,16 | Darth 53:6 | discharge 29:7 30:3 | Educated 8:16 | Fain 2:5 |
| 39:23 40:4 41:14,22 | Date 81:12 | 36:16 | education 8:14 | far 11:21,22 34:18 |
| 50:3 55:15 62:7,8 | dated 13:17 | discharged 30:2,4,22 | either 4:14,20 10:1 | 66:20 72:9,15 |
| 73:6,12,14 | dates 66:14 | discomfort 32:22 64:12 | 20:17 21:20,22 25:2 | February 37:19 38:18 |
| concerning 37:7 64:16 | Daugherty 1:16 4:7 | discuss 73:19 | 25:14 38:1 40:12 | 38:19 39:12 |
| concluded 79:10 | 80:4 81:11 | discussed 19:10 23:21 | 43:15 44:1 50:13 | federal 4:5 6:21 7:6 |
| condition 30:21 37:22 | David 2:4,4 6:2,18 | 26:3 31:15 32:4 40:2 | 55:3 | feel 51:16 74:20 |
| conditions 10:3 51:11 | day 31:3 36:11 55:18 | 50:20 55:21 71:23 | emergency 11:7,11,18 | fees 74:12 |
| 52:1 68:4 | 55:22 56:1 81:8 | discussing 26:13 50:1 | 11:23 12:3 16:17 | felt 22:16 24:11 32:8 |
| CONERLY 2:9 | days 29:10 36:20 | 51:8 71:11 72:2 | 17:1 | 39:19 41:8 43:7 51:5 |
| conscious 18:1 | debrided 28:1 | diseased 50:14 | end 15:20 18:15,15 | 52:13 75:7 |
| consider 54:20 | debridement 12:15 | displaced 26:23 43:9 | 20:17 21:20,22 25:11 | femur 20:14 |
| consistent 17:17 28:1 | 22:17 28:20,21 50:6 | displacement 35:4 | 27:22 57:13 68:13 | few 55:22 58:14 62:14 |
| 29:18 51:13 63:8 | decide 55:2 | displacing 40:3 | ends 25:14 28:12 | fifth 16:4,5 33:1 |
| consulted 11:17 | DEFENDANT 2:8 | District 1:1,2 5:14,15 | enough 14:22 26:22 | file 60:13 |
| contain 81:1 | defendants 1:10 5:11 | 80:18,19 | 35:8 | filing 4:18,22 |
| contaminated 28:15 | 6:6 80:17 | Division 1:3 5:16 80:20 | entertained 32:5 | find 11:10 12:4 38:20 |

Deposition of N. Tucker Mattox, M.D.                Wilker vs. US Services                January 17, 2008

Page 3

39:14 43:4 52:11
53:15 55:11 57:1
58:12 59:9
findings 63:8
fine 37:2 53:20
finished 28:23
first 6:13 10:14,15 11:2
14:3 16:10 22:5
23:23 31:12 40:14
59:15
five 19:12 29:10 36:20
39:21
fix 12:23 43:16
fixation 12:22 35:21
43:18 69:13
flexion 55:4 56:9,12,17
56:17,20 59:13 72:14
73:8
floor 7:23
follow 36:18 63:19
following 8:21 78:17
follows 6:15
foot 13:2 16:5,7 20:19
33:23 34:1,3,8 37:1
38:21,22 43:5 52:19
53:20,21 58:19 73:4
73:4
foregoing 80:23
foreign 22:20 28:6,13
28:16
form 4:11 13:23 22:22
27:8 28:8 44:22
46:20 48:2
formal 58:21
formality 4:9
formerly 27:18
forms 15:20
forth 38:3
found 11:16 12:10 27:5
34:4
four 29:10
Fourth 56:4,6
fracture 12:11,13,18
12:20 13:1 14:3,9,15
15:2,12 16:1,5 18:12
18:14,19 20:3,4,9,11
21:21 22:7,9,16 23:9
23:16,23 24:5,6,10
24:11 25:1,6 26:10
26:17,21 27:12 28:11
28:12 31:14,15 33:2
33:8 34:5,8 35:2,23
37:5,10 39:6,19 40:1
49:23 62:10 70:13,14
71:12,13,21 76:5,22
77:3,13
fractured 24:13
fractures 13:5 23:1,4
24:21 33:7 38:4

42:12 58:18 61:18
72:15,17,21
fragment 31:9 32:7
40:1,6 41:14,23 42:4
43:9,12,15,20 50:2
51:7 72:1
fragments 26:22 27:13
27:16 28:16 31:22,23
from 3:5,6,7,9,10,11
7:21 14:5,18 19:20
21:23 29:13 30:12,23
32:1 40:14 41:5 47:4
57:12 59:7 61:16
65:21 71:8
front 19:20
fulfilled 9:16
full 7:13 55:3,4,14,17
59:12 72:5,13 73:7
fully 75:7
further 4:16,23 25:20
26:8 37:8 40:3 47:15
62:16 71:18,22 73:19
75:21 79:15 81:5
future 62:6 73:18 77:9
78:5

G
gave 77:16
general 17:6 18:5 36:3
49:21
generally 7:5 16:6
40:17
getting 33:19 38:5 55:3
56:16 59:15 60:18
give 39:9 44:20
given 16:11,14,18,18
17:21 46:1 51:19,23
64:16
go 19:13,18 24:22 30:2
30:13 35:20 38:11
43:13 45:14,18,21
49:3 68:11
goes 20:13 25:1 47:9
going 7:1 10:19 18:20
22:9 26:2 27:20 35:8
40:4 41:17 42:17
44:16 49:13 52:16
59:16 60:23 62:5
63:6,10 68:12 76:9
77:2,8 78:4
good 6:18 23:17 33:3
49:11
gotten 73:7
grade 14:18
graded 14:19
gradual 75:8
gradually 52:17,20
graft 26:11,12
grafting 71:15,16

grafts 25:20
grass 28:18
Griswold 2:12
gross 27:22 28:5,10
grossly 28:15
grounds 63:11,13
group 8:8 70:7
guarantee 76:12
guess 28:5 33:23 70:12
71:11,19 72:1

H
half 8:23 20:19
halfway 27:21
Hall 2:9,9,19,21 6:5,5
13:22 22:22 23:6
27:8 28:8 44:7,10
45:11,16,19 46:8,23
47:4,9,16,20 48:2,7
48:11,18 63:10 66:19
67:6,14 69:3,11
76:18 78:2 79:6
hand 6:9
happen 23:8
having 6:13 28:2 32:18
33:20 41:15,19 59:13
60:18 62:1,4 64:6
75:8
heal 23:20 25:1 38:4
39:9
healed 71:16 72:16,18
72:21,23
healing 25:1 53:20
58:18
healing-wise 23:17
health 74:12
held 5:13
help 54:16 55:3 59:19
helps 55:7
her 10:14 11:9,17,19
12:1,9,10,15,19
16:12,21 17:1,2,15
18:1,4 19:8,21 20:8
26:3 27:18 28:2 29:3
29:4,19 30:3,5,7,16
30:16,18,21,23 31:1
31:1,2 32:6 33:1,13
33:23 34:11,12,15,18
35:7 36:18,20 37:5,5
37:21,23 38:3,17,18
38:21,21,22,23,23
39:1,5,12,16,18,21
39:23 40:14,14,19,20
40:22 41:2,5,8,9,10
41:11,16,17 42:8,15
43:1,5,5,10,11,19
49:20 52:8,12,14,14
52:16,18,20 53:14,16
53:19,20,20 54:11,16

55:10,12,14,15,19
56:21,23 57:2,6,7,10
57:22 58:1,2,4,10,15
58:16,19,19,20,22
59:2,7,14,21,22 60:4
60:8,12,18 61:11
62:1,3 63:9,22 64:2
67:22,22 68:4 72:5,6
72:9,11,13,15,17,19
73:4,5,7,9,19 74:1
75:4,12,22,23,23
76:6,22 77:4,10
78:15,17
hereto 4:21 5:1
herself 58:23
hesitate 45:9
high 24:17 30:15
higher 76:6,7 77:6
78:19 79:2,4,5
him 17:15 45:17 63:3,4
history 17:21 51:19
52:1
Hodurski 8:6,7 53:5
hole 20:23
holes 19:17,18
hollow 21:5,10
home 30:3,3,4
honestly 18:2 29:6
36:12 61:5
hook 10:20
hospital 11:20 19:6
29:1,3,5,10,13,23
30:18 34:12 36:8,14
40:15 49:20 68:1
74:4,7,8,13,16,19
hospitalized 36:5
hours 55:22
huge 27:6
Hughston 63:2
hundreds 70:2,3
husband 26:4

I
idea 74:5
identification 8:10
13:20 64:21 65:14
66:9,22 67:9
improve 55:13 75:3
improved 58:13
improvement 59:20
75:8 76:1
improving 43:7 53:16
inches 19:12
incision 20:22 37:1
38:22
incisions 21:2 31:3 41:8
43:15
includes 65:1
including 11:14 25:20

INDEX 2:16 3:1
indicate 14:20 42:1
48:20
indicating 27:15 56:20
indications 22:15
infected 37:8
infection 18:11,13
22:21 23:15 71:2,15
influence 47:18
inhibiting 42:8
injured 22:6 50:13
69:21 78:6
injuries 10:2 11:16
12:9 16:16 24:21
26:5 29:20 33:17
51:12,16 54:17 58:2
58:4 62:2 68:5
injury 11:16 24:9
39:21 41:5 50:5
51:20 59:7 62:9 76:4
78:14,18,20,21
insert 20:23
inside 12:17 18:16
20:13,16 21:1,4,11
instead 35:5
instructions 45:13,23
instrument 43:14
insurance 73:22
interested 81:7
interfere 47:8,14
internal 12:21 35:21
43:18 69:13
internship 8:19
intervention 40:5
76:16
intramedullary 12:16
intra-articular 33:8
34:7 62:10
introduce 5:22 13:11
68:21
introduced 4:19 8:12
introducing 69:5
involved 11:12 17:12
23:3 27:12 51:13
involvement 42:2
irregular 50:15
irregularity 50:4
irrigation 12:15 22:17
28:21
issue 61:15 64:2 72:18
issues 75:6
IV 16:18

J
J 2:9
Jack 2:9 6:5
January 1:20 5:16
10:16 11:4 13:17
26:1 29:14,14 30:18

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services          January 17, 2008

Page 4

31:7,8 60:11 68:2
80:22 81:8
job 60:4
joined 8:22
joint 10:2 15:21 16:2
24:13,22 25:7,8 32:8
77:4,5
joints 9:22
Jr 2:9
judge 48:9
judges 7:6 46:1
June 9:5
just 7:19 8:2,11,13 13:2
16:6 18:8 19:3 21:12
25:13 30:14 31:15
32:16 36:11 39:8
44:7 46:4,13 49:18
53:10 55:21 58:20
59:7 60:23 62:18
65:16 69:4 78:23

**K**

keep 38:3
keepers 21:17
keeps 21:22,23
kidney 39:15
kin 81:5
kind 9:21 21:4,12
28:14 53:3 61:16
62:1 64:6,11 77:12
knee 12:12,19 14:6
15:19,21 18:19 19:9
20:1,22 23:14 24:9
26:6 31:1,10,14,19
31:19 39:5 41:15,20
42:1,5,6,11 43:6
49:14,22,23 50:6
54:21 55:16 56:13,16
56:18,19 57:2 62:5,8
62:20,23 63:7,16
64:7,10 71:19 72:8
73:6,13 76:6,23
78:15
knees 62:2
know 11:21,22 16:8
43:12 46:3,17 61:2
62:13,15 63:3,4
66:20 74:3,18
known 69:12

**L**

lacked 58:14 59:11
72:13
lacking 53:17 55:16
lady 10:12
Lane 53:22,22 54:1,2
large 1:18 4:8 14:21
80:6 81:13
larger 14:7

last 7:19 8:4 33:12
57:19,21 59:2,4,22
60:9 62:3 63:8 66:12
72:11,12,19 73:8,16
75:4 76:22
later 7:2 9:13 18:21
24:14 25:18 40:22,23
63:17 71:23 73:15
77:6,9
lateral 27:6,10 32:13
Law 2:4,5,10
lawyer 77:17
leading 44:12,15 46:2
46:11,21 47:23
least 72:6
leave 32:9
leaves 25:2
left 12:19 13:2 15:7,18
16:1,5 18:19 19:8,22
20:1,3 22:2,2 24:4,9
24:10 31:1,18,19,19
32:3 39:5 40:2 41:14
43:6 49:22 52:17
53:19,20 54:21 55:15
55:16 56:5 57:7,8
58:16 62:8 71:19
72:8 73:4,6 76:6
leg 12:12 14:10,12
20:20 22:3,6 28:2
37:6 38:2 39:18 40:3
40:12 41:10 43:5
52:18,18 53:8,11,19
53:19 55:6,7,12,16
55:23 56:5,11,14
57:7,8 58:16 73:4
legs 20:15 23:5,9 38:3
length 20:19 21:23
35:6
less 18:10
lessening 25:11
let 13:15 20:2 22:13
30:8 45:12 52:16,20
58:22 65:2 66:10
letter 60:11
let's 44:7 48:22 65:3
licensed 10:4,7,8
life 77:10
like 7:6 12:6 19:13
20:15 28:19 30:11
31:9,23 32:9 36:10
37:7 38:8 39:19 40:3
40:18 41:8 42:11
43:7,8 51:5,16 52:14
53:3,19 62:6 64:5,11
66:2 73:9,21 75:7
78:15
likely 32:21 77:1,11
78:3,6,11,22 79:1
line 33:12 56:4,6

lined 35:6
lines 26:16,16 28:20
38:16
Lisfranc 34:6
literally 28:17
little 41:19,22 55:2
59:13 70:13
LLC 1:9 5:10 80:15
local 5:21
location 32:3
locations 33:19
long 14:5,10,12 15:17
19:11,12 20:18 23:4
23:9,14 29:5 36:8,9
60:3 61:4
longer 10:9 27:1 50:14
long-term 24:12
look 64:4,5,11 66:14
looked 31:23 37:2
38:22 40:3 41:8 43:8
52:14,15 53:19 78:15
looking 13:7,18 37:2,7
39:22 43:6 57:16
60:8,10,21 78:16
looks 19:13 31:9 63:20
66:2 73:21
loose 31:10 32:1 50:2
51:6
Lortab 40:22,23
lose 25:14
loss 25:4
lots 27:16 32:17
lower 12:11 20:20 31:17
37:6
Lyn 1:16 4:6 80:4
81:11

**M**

made 4:11 16:9,21 18:3
67:20
major 26:5 55:18
majority 60:7
make 18:10 20:22 21:1
44:21 45:3,6 46:14
47:5 48:7 65:9,15,17
makes 41:22 64:9
management 25:21
26:8 42:18
manner 4:20 81:7
many 24:2 69:17
MAR 3:2
March 42:15 43:1,23
49:12
marked 8:9 13:19 30:8
64:20 65:2,13 66:8
66:21 67:8
marrow 21:7,9
material 22:20 28:13
28:14

materials 28:7
matter 5:7 65:1 80:11
Mattox 1:14 2:17 4:4
5:7 6:12,18 7:14
10:11 18:6,20 20:21
41:2 53:13 54:22
55:9 59:9 60:2 69:1
69:12 76:21 80:8
Mattox's 3:4
may 4:6,12,13,19 10:20
25:19 56:21,22
mean 14:12,16 23:10
24:1 26:18 27:7
31:11,12 32:12,14
33:15 48:12 54:22
meaning 12:12 31:8
61:6 79:4
meant 14:22
measurement 59:10
measures 29:12
medical 8:17 10:18
11:6,14 46:3 64:18
66:6,17 67:4,13,17
73:23
medication 16:11
40:13 44:4 57:10,19
58:1
medications 40:17
42:22
medicine 10:5 16:19
40:22 57:12,17,21
members 8:7
mention 31:6 54:1 56:8
mentioned 9:6 22:14
33:1 41:13 42:4 75:6
mess 44:14,18
met 10:15 11:2,10
metatarsal 16:4,6 33:2
34:2 35:3
meticulously 27:23
Michael 1:5 5:8 80:12
mid 34:2
middle 1:2 5:14 34:22
35:22 80:19
midfoot 33:13 35:1
might 25:7 34:6 37:7
71:21
mine 57:3
moment 44:8,11
Montgomery 1:20 2:6
5:20 8:22 9:3 66:6,18
67:5,13 80:3
month 8:4 59:18,21
months 20:10 59:6
61:4 63:23
more 22:6,11 29:22
42:9,10 57:7,8 70:13
77:1,11 78:5,8,9,23
79:1

most 57:12
motion 41:16 42:8
52:13,15 53:16 72:6
72:9,19 73:7,10 75:6
motor 11:13 17:20
33:18 54:13 58:5
67:21 68:2
move 8:2 13:10 21:18
37:22
moved 7:19,21 25:10
32:1
moves 68:20
much 69:2 74:3 76:6,7
77:5 78:18 79:2
multiple 33:17
Murray 1:9 5:10 80:15
M.D 1:15 2:17 4:4 6:12
80:8

**N**

N 1:14 2:17 4:4 6:12
7:14 80:8
nail 12:16 18:15 21:16
name 7:13,14 55:20
named 10:12
narcotic 40:21
nature 23:23 26:4
44:12
near 77:9
necessarily 22:12 32:15
necessary 9:9 34:17
54:10 58:1 67:22
need 4:11 21:9 45:12
45:23 47:5,7,13 48:6
54:15 55:2 60:12,14
62:5,16,21 63:7 65:9
68:9 73:17 75:15
needed 22:8 43:8 54:16
60:19 64:10
needing 26:12 79:2
needs 12:4 63:16 75:18
negotiates 74:11
neither 81:5
never 75:18
next 26:14 33:12,14
38:19 41:1 52:7
53:12
nicely 72:21
night 36:13
nine 59:12
non 33:5,9 40:10,12
41:12 42:19 44:1
none 71:4 76:3
nonunion 23:18
Normandie 7:16,21
North 2:10
Northern 1:3 5:15
80:20
note 31:7

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services          January 17, 2008

Page 5

noted 24:17 25:19 27:5
38:21 39:2 41:19
48:14 50:3 53:18,21
58:19 59:16 71:20
notes 54:6
nothing 6:14 80:10
notice 60:10
number 5:12 73:6
Nurse 17:9

—————————
**O**
oath 6:1
object 13:22 22:22
44:12,17 63:10 69:5
69:7
objecting 48:13
objection 23:6 27:8
28:8 44:22 45:4,7
46:14,20 47:2,23
48:14 66:19 67:6,14
objections 4:10,10 47:6
48:8
observation 33:11
75:23
obtained 73:2
obviously 19:18 22:8
38:4 39:16
occasion 10:11
off 10:19,20 50:7 53:2
68:12
offered 4:13
office 19:4 30:6,13,16
31:2 34:4 37:21,21
41:1 52:9 54:6 58:9
60:13 65:12,20 66:4
offices 1:18 2:4 5:18
oftentimes 33:16
Oh 20:19
okay 7:21 8:2,5,16 9:6
10:19 11:1,9 13:4
15:1,4 19:7 20:6,8
21:4,16 23:22 29:16
30:8 32:18 36:14,18
38:22 40:13 46:23
49:2,6,11 53:5,8 54:4
62:20 64:15 65:5,15
75:14
old 7:22
once 18:7 19:4
one 8:7 14:18 19:22
22:5,11 24:6 26:8
31:23 34:23 36:13
37:9,11 52:18 53:8
60:9,15 65:3,16
68:14 71:13,19 72:2
72:7 73:7 74:10
75:18 78:8,9
ones 58:19
only 63:11 72:18 78:5

open 12:11,12,13,21,22
14:2,9,15 15:2 20:3,5
22:7,16 23:1 24:7
26:10,17,18 35:21
37:5,10 43:12,17
69:13 71:12,13
opened 26:20
opening 35:23
operating 17:3 18:4
operation 26:20 36:21
70:22
operative 13:16 22:4
26:15
opinion 25:23 34:18
51:2 54:14 57:23
58:4 60:2 61:13 62:4
63:6 64:3 67:19
72:20
opinions 64:15,17
77:19
opposite 18:17
oral 9:14
ORF 43:17
Originally 40:20
Orthopaedic 1:18 3:5,6
5:19 7:16 8:23
orthopedic 7:15 8:19
8:21 9:10,11,21,23
11:16 12:9 33:17
61:16 69:20 70:20
other 4:10,14,20 10:7
15:14 21:8 22:11
25:21 33:19 52:2
58:8 62:21 63:12
68:3,4,4 70:7 71:2
72:15
others 8:6
out 18:9,9,10 20:11
21:14,23 22:19 27:2
28:11,12,22 32:7
35:6 38:23 41:5,9
46:4 47:4 48:23
53:18 55:7,23 56:15
72:1,4 75:17,17 81:3
outside 16:7 28:14
over 17:2 26:9,14
39:19 45:17 54:16
63:2 76:11
overnight 36:11
own 37:23
Oxycodone 40:21

—————————
**P**
page 26:14
pages 13:11,13 80:23
paid 73:23 74:3
pain 16:11,12,19 25:9
25:16 32:19 33:20,22
34:3 40:13,21 42:22

44:4 50:22,23 57:10
57:12,15,19,21,23
58:1 59:14 64:6,12
76:9
painful 42:12
pan 38:12
pardon 44:9
Park 2:5
part 15:6 16:7 34:3
54:6 60:12
particular 37:14
particularly 23:17 33:7
parties 4:3,17 5:1 81:3
81:6
party 4:14,20
patient 17:23 23:8 25:9
25:18 29:19 40:18
50:18,22 61:6 64:13–
patients 10:1 23:18
33:16 36:9 62:21
70:20,21
pause 10:23 68:15
pavement 28:18
pay 37:13
payment 74:21
pending 6:21
people 33:18 53:7
69:21
perform 11:18 35:12
70:8,21
performed 17:4 69:12
69:17 70:1
period 33:10 60:3 61:3
78:17
permanent 61:18
permitted 46:13
person 74:18 77:12
personally 63:4
phone 10:20
phrased 46:11
physical 29:11 53:23
54:5,7,15 61:12
physicians 70:7
pieces 24:2,16 27:17
32:17 35:2
place 12:23
placed 13:2 29:1
placing 12:23
plaintiff 2:3 3:2 6:3
68:20
Plaintiffs 1:6 5:9 80:13
Plaintiff's 8:9,13 13:19
64:20 65:13 66:8,21
67:8,10
plan 43:12
plate 18:18 19:9,11,15
19:16,19 22:10 31:16
plateau 12:19 15:12,22
16:1 18:18 24:10

31:14 32:13 39:6
40:1 70:12 73:13
play 7:2
please 6:1,10 8:15
10:14 27:9 52:7
68:10
point 31:21 32:23
37:19 38:13,21 39:3
39:7,18 40:15 43:7
43:23 51:9 52:12,22
53:9,16 55:12 56:2
57:14 58:20 59:10,16
60:5,17 62:18 63:16
63:22 75:5
points 30:15
popping 41:20 42:1,8
42:11 50:23 51:2
portion 23:14 24:4
27:1 73:12 77:5
position 33:3 36:2 42:6
42:9
positive 15:5 41:21
possibility 62:16 63:21
75:15
possible 75:20
possibly 21:21 26:7,12
43:16 61:4 63:17
posttraumatic 24:18
24:19,20 25:22 50:20
62:12 73:15
post-op 29:11
potential 23:10 24:14
37:11 71:19 72:7
powdered 32:12,15
practice 8:5,22 9:10,21
9:23 10:5,10 69:20
practicing 9:3
precursor 50:19
predict 76:8 77:7
preoperative 14:1
prescribe 40:17,19
54:7
prescribed 55:1
prescribing 40:13
prescription 57:10,16
57:20,21
prescriptions 57:18
PRESENT 2:12
presented 11:11
prevent 22:20
printout 65:9,17
print-off 65:11
prior 71:14 72:3
probably 15:8 19:12
38:14
problem 42:10 46:9
52:19 62:1 72:8 73:5
77:9 78:19
problematic 42:7 43:10

problems 25:16 37:11
50:17 62:11 76:10
77:2,6,11
procedure 4:5 17:3,5
22:3 23:19 28:23
32:2 36:6 49:14,15
50:9 52:6 69:16,19
70:1,6,10,15,17 72:3
75:16 78:4,11,23
79:3
procedures 37:8 62:17
69:13 70:8 71:8,10
71:22 76:15
proceed 48:23
proceeding 64:23
process 25:1
produce 21:7
professional 7:13 8:14
program 9:12
progress 30:16
progressed 57:5
pronounce 15:10
proper 36:1
protects 25:13
protruding 14:17
provide 74:22
provided 4:15,21 74:1
74:13
proximal 16:8 24:5
pull 55:7 56:18
pulled 26:21
purpose 4:14 21:6,7
pursuant 1:15 4:5
put 12:16 18:15,17
20:17,18 21:10,16,17
21:19,22 35:9 38:1
38:23 40:9 41:10
45:14,21 52:16,20
55:6,22 57:7 60:21
69:4 76:6
puts 25:4
putting 17:14 36:1,2
52:17 55:13 58:15
P.C 2:4
p.m 1:21 5:21 79:11
P.O 2:6

—————————
**Q**
question 4:11 13:23
28:9 44:20 45:5,10
46:22 48:15 63:14
66:16 67:3 78:9
questions 4:10 44:13
44:16,23 45:2 46:2,4
46:10 48:3 68:23
70:23 74:6 77:15,18

—————————
**R**
raise 6:8

Deposition of N. Tucker Mattox, M.D.                    Wilker vs. US Services                    January 17, 2008

Page 6

---

range 41:16 72:9
rather 45:1 60:21
rating 61:22
read 7:7 36:23
reading 7:8 81:3
ready 49:3 69:9
real 72:18 77:8
really 18:8 22:11 24:9
  43:6 46:15
Ream 21:14
reamers 21:14
reason 32:4
reasonable 64:18 66:5
  66:17 67:4,12 74:21
reassemble 27:3
recall 16:13 17:23 18:2
  28:17 29:6 36:12
  53:10 60:5 61:5
received 57:12,18
recently 8:3 30:22
recertified 9:1
recommend 42:15
  76:14
recommended 61:8
record 47:16 48:15
  68:13,17 69:4
records 3:4 13:8,9
  30:13 36:15 46:5
  54:5 56:8 57:17
  60:13
reduce 16:12 18:14
reducing 36:1
reduction 12:21 35:21
  43:17 69:13
refer 13:15 62:21
reflected 67:18
regain 72:5
regard 12:8 13:7 22:2
  37:10 56:11 61:23
  64:15 67:16
regarding 77:19
regardless 4:21
regards 56:5
regularly 46:2
relatively 14:21 21:10
  24:7
remember 53:9
removable 41:11 53:1
remove 43:11,15
removed 50:2
replace 32:7
replacement 62:5 63:7
  63:16 64:8,10
replacements 62:20,23
report 13:16 22:4
  26:15
reported 80:6
Reporter 1:17 4:7 6:8
  80:5 81:12

REPORTER'S 80:1
representing 4:3,17
request 13:10
Requested 59:18
require 12:14 22:9
  23:19 25:19 26:8
  35:9 37:8 40:5 71:17
  71:21,22 72:4 75:20
required 29:10 31:16
requirements 9:17
requiring 59:14
reserved 4:12
residency 8:19 9:12
resident 10:9
resolved 75:7
response 16:5 41:21
  77:18
resulting 71:7
results 73:1 81:7
reviewing 46:6
revision 43:16,17
re-dressed 31:4
re-splinted 31:4
ride 59:19
right 6:9 7:5,12,18 9:4
  9:16,18 10:4 12:6,7
  12:11 13:1 14:2,4,9
  14:10,10,12,13,14
  15:2,4,17,19 16:9,20
  17:5,10 19:15,22
  20:6,6,8 21:15 22:13
  23:11 24:3,6 25:10
  25:17 26:1,14 27:5
  27:20 29:22 31:1,6
  31:19,20 32:11,20
  33:1,3,11 34:1,17
  35:12,18,22 37:5,9
  37:17 38:17 39:10,18
  40:7,8,11 41:4,5,10
  42:4,20,21,22 43:2,5
  43:5,21,22 44:2,3,5,6
  47:3,11,12 48:1 50:8
  50:9,11 51:9 52:5,9
  52:18 53:4,11,12,19
  53:21 54:18 55:12,14
  56:7,21 58:8,11 59:1
  59:6,23 60:1,2 61:15
  61:23 63:1 65:22
  66:23 67:22 68:3,6,8
  69:9 70:16,19 72:16
  72:22 73:4,4 77:22
  78:7,14 79:4,8
risk 18:11,13 23:15,18
  23:20 24:17 25:4,22
  25:22 26:12 71:15
  72:3 76:7,7 77:6
  78:19 79:2,4,5
risks 23:3,8 24:14
  37:10 71:1,9

road 25:5 62:12 63:19
Robinson 1:9 5:11 6:23
  80:16
rod 12:17 18:16 20:12
  20:16,18 21:1,10,19
room 11:7,11,18,23
  12:3 16:17 17:1,3
  18:4
rotating 22:1
rotation 21:21 23:21
roughened 25:15
roughening 25:8
routine 69:19 70:10
Rules 4:5
ruling 4:12
runs 14:5 19:20

---

**S**

SAITH 79:15
same 4:22 12:21 15:17
  26:4 40:6 45:20
  66:16 67:3,10,14
satisfaction 72:16
satisfied 73:1,5
saw 11:2 30:7 31:2
  36:20 40:14 43:1
  52:8 53:14 55:10
  56:23 58:9,10 59:2
  59:22 62:3 63:9
  72:11,13 73:16 75:4
  76:22
saying 23:22 78:3,5,14
  78:22
says 17:8 22:5 32:12
  39:15 43:16
scan 34:9,13,14,15,16
  34:21,22
scanned 13:12
scenarios 9:15
scheduled 43:19 63:5
school 8:17
scope 43:13 78:16
screw 19:20 21:22 36:2
screws 12:23 18:18
  19:10,13,18 20:17
  21:3 22:10 31:16
second 7:23 15:6 23:19
  31:15 34:2 35:3,10
  35:12 36:19
secure 12:18 18:16
  19:19 20:17 21:11
securing 21:20
see 10:11,14 11:17 20:8
  21:3 28:15 30:14 37:8
  38:17,18 39:12 41:2
  41:17 52:7 53:12,21
  55:8 56:21 60:8 63:1
  63:19 64:4 65:3
  73:17

---

seeing 30:5 64:2 78:15
seems 31:10
seen 12:1 17:1 63:22
  75:12
send 34:12,15
senior 8:7
sent 13:9
sentence 33:14 54:19
serious 22:12 26:4
  70:13
seriously 22:6
serve 21:6
served 64:7
serves 21:7
services 1:9 5:10 6:22
  74:13,22 80:15
set 34:11,16 81:3
seven 41:4 59:6 61:4
several 35:2
severe 76:5
shaft 14:3 15:2 23:13
  24:5
sheet 66:12
she'd 49:23 62:11
shortened 35:6
shortening 23:20 35:4
Shorthand 4:7 80:4
show 18:23 19:15 30:8
  34:21 57:17 65:2
  66:10,23
showed 35:4
shower 38:8
shown 22:4
shows 19:9,16
side 15:14,18 18:17
  19:16,23 20:3,7,8
  31:11,18 39:1 44:1
  55:15
sides 41:12
sign 7:8
signature 5:2 7:10
significant 32:22 34:7
signing 7:9 81:3
silent 48:12
since 10:19 63:22 64:1
  75:12 76:22
sir 7:5,12,18 8:15 9:16
  10:4,14 16:9,20 17:5
  25:17 27:20 29:22
  31:6 34:17 35:18
  37:9 45:11 49:5,10
  50:8 52:5,7,9 54:18
  56:21 58:8,11 59:1
  66:23 68:3,8 77:22
  77:23 79:9
situation 12:16 19:21
  23:1 56:16
six 19:12 39:20 41:4
  61:4 63:22

---

skin 14:16,18,22 18:12
  20:11 25:20 26:9,11
  28:11 71:16
sleep 17:15,15
slip 60:6,9
slow 75:8
small 21:2 24:16 26:22
  27:13,16,17 31:22
  32:17 43:14
smaller 34:23
smooth 50:15
smoothing 50:6
some 13:7 16:11,18
  18:22 19:1 21:14,17
  23:18 25:7,8 27:12
  27:21 28:6,15 32:9
  32:18 33:22 35:4
  40:5,15 41:4 42:1
  44:21 50:4 52:16,17
  52:20 53:7,17 56:8
  58:8 60:19 64:22
  69:6 75:6,8 76:12
  77:15,16 78:11
somebody 78:20
something 12:4 22:14
  28:6,19,19 36:10
  37:13 38:15 48:22
  53:1 54:10 55:21
  70:4
sometimes 55:1 60:5
sorry 36:17
South 1:19 3:7,9,10,11
  10:18 11:6,12,15
  12:1 34:12 35:16,17
  49:20 66:12 67:1,11
Southern 1:18 3:5,6
  5:18 7:15 8:23
speak 6:14 80:9
speaker 10:19
special 45:13,23
specialist 12:6
specifically 16:14
  40:19 61:1
speculation 62:18
splint 54:20 55:20 57:5
  58:23 59:17
splints 30:23 38:2
  54:23
split 24:23 26:21
spoke 76:3
staff 11:14
stamp 30:9
stamped 13:12
standing 46:19 47:1,22
standpoint 61:17
start 30:5 33:19,20
  52:16
started 16:18 41:15
  52:12 59:15 69:3

Deposition of N. Tucker Mattox, M.D.          Wilker vs. US Services          January 17, 2008

starts 30:10
State 1:17 4:8 80:2,5
  81:13
stated 63:12
states 1:1 5:13 10:7
  80:18
stationary 59:19
Statute 4:15,21
stay 36:8,9
stayed 36:11
Stevens 17:9
stick 20:16
still 32:18,22 33:5 38:3
  38:12 39:7,7 40:9,10
  41:11,13 42:19,22
  44:1,4 52:22 53:17
  55:15 56:2 57:3,9,9
  57:15 58:14 59:11,13
  75:5
stipulated 4:2,16,23
stipulation 1:15 47:21
STIPULATIONS 4:1
stop 58:21
straight 55:7 56:10,17
straighten 55:22 56:15
straightening 53:18
  55:5 56:13 58:13
  73:11
Street 2:10
strengthening 58:23
  59:20
struck 28:6
subsequently 11:18
suggest 45:1
suggested 61:7
suggestive 46:12
Suite 1:19 2:5,10
summary 29:7 36:16
supposed 27:2
sure 10:22 34:14 62:15
  68:11
surface 24:23 25:2 27:3
  27:7,10,18 42:2
  63:20 76:23
surgeon 7:15
surgeons 1:19 3:5,6
  5:19 7:16 70:20
surgeries 30:23 60:16
  73:17
surgery 8:19 9:10,11
  9:22,23 11:19 16:22
  25:20 26:2 29:23
  32:6 35:9,10,13
  36:19 43:11 49:21
  51:11 69:20 71:1,14
  75:21
surgical 32:2 50:9 71:8
  71:9 73:20 76:15
  78:11

survive 26:10
suspect 76:11
sustained 54:17
sutures 38:23
swelling 32:19,22
switched 40:22
sworn 6:9,13 80:9
symptomatic 42:7 77:8
symptoms 51:1

T
take 6:19 7:1 9:12
  10:20 16:21 17:13
  18:4 27:2 38:7,8
  43:10 44:7,10 46:23
  48:8 53:2 72:1
taken 1:15 4:4,6 5:7
  17:2 41:9
taking 10:1 32:6,6 44:4
  57:15
talk 45:17
talked 18:8 24:7
talking 11:2 18:20
  23:13 24:4 26:6
  27:11 40:7 45:20
  49:13 51:10 54:4
  65:18 75:14
tape 44:14,18 68:14,18
tapes 68:10
task 60:21
technical 12:20 15:22
tell 7:12 8:11,13 9:20
  24:19 30:14 45:12
  46:18 49:17 56:10
  78:13
Tennessee 8:20 10:8
term 12:20 15:22 24:20
  28:10 32:16 34:7
  53:6
terms 56:10
Terry 63:2 64:1
testified 6:15
testimony 47:19 78:10
thank 48:18 69:1 77:23
  79:7,8
themselves 5:23
therapist 53:23 54:5
  55:2
therapy 29:11 54:7,15
  54:16 58:22 61:12
thereof 81:7
thick 50:14
thing 67:10
things 26:7 64:23 71:2
  72:2
think 29:8 38:14 49:12
  53:5,10 60:23 65:3
  66:13 67:11 72:9,20
thinned 50:16

third 50:9 51:10
thought 32:5
thousands 70:2
three 14:19,20 26:15
  48:4
threes 14:19
through 13:13 14:18
  18:12 19:14,17,18
  20:11 21:21 28:11
  30:13 34:10 57:13
  66:14 78:16
throughout 51:22
Thursday 1:20 80:22
tibia 12:11 14:4,5,7
  15:19 20:14 23:12
  24:5 26:6 27:7,19
  31:2,19 33:8 39:1,18
  52:19 58:20 71:12,14
  76:5
tibial 12:19 14:3 15:2
  15:12,21 16:1 18:18
  24:5,10 31:14 32:13
  37:4 39:6,17 40:1
  70:12 73:12
tibias 37:3
tighten 55:6
time 4:12,12 5:21 12:10
  12:21 13:10 26:4
  30:21 32:19 33:6,10
  36:22 37:3,16 38:20
  39:9,14 40:14 41:7
  42:20 43:4 44:21
  45:6,20 46:13 49:9
  50:1 52:11 53:15
  54:20 57:1,2,11,18
  58:12 59:2,9,11,22
  60:4,7 61:3 63:8
  68:23 69:2 76:1,11
  78:9
times 48:5 67:23 69:17
  70:2,3
tissue 28:16
today 5:16 31:8
toes 16:8
together 35:9
told 35:7 43:10 58:20
tolerated 57:6
top 20:23 27:4
total 67:2
totaled 65:6
transcript 81:1
transport 60:20
transported 60:15
transverse 24:8
trauma 70:19,21
treat 10:12 29:19 68:4
  70:19
treated 12:5 51:12,17
treating 60:8 70:20

72:6,17
treatment 20:10,12
  34:18 42:18 51:22
  54:11 57:13 61:21
  67:18,19,20,22 69:23
  71:4,18 73:2,20,23
  75:22 77:20
treatments 61:12 67:23
treatment-wise 61:10
trial 4:19 69:8
tried 7:3
trouble 41:15 60:18
truck 17:18 28:2 51:14
  51:18 52:2 54:14
  58:5 67:21 68:5
trucking 6:22
true 70:11 73:18 75:19
  81:1
truth 6:14,14,15 80:9
  80:10
try 47:17 48:20 60:19
  61:11
trying 22:19 32:7 44:13
tub 38:7
tubes 20:15
Tucker 1:14 2:17 4:4
  5:6 6:12 7:14 80:8
turned 72:4
two 9:1,13 14:6,7 20:9
  20:14 21:2 26:16
  36:12,13 68:18
Tylox 40:20
type 14:2 15:1 16:16
  24:11 29:19 51:1
  61:22 70:14 76:4
  77:3 78:14
types 70:8
typical 69:22
typically 16:15 21:9
  24:8,22
typo 39:16

U
Uh-huh 15:5 41:21
unable 60:4,6 61:2
uncommon 70:14,18
under 14:1 17:6 18:4,7
  22:15 36:3 49:21
  76:2,14
undergraduate 8:16
understand 63:6
uneven 25:3,15
uneventfully 71:17
United 1:1 5:13 80:18
University 8:17,18
urgent 12:14 22:8
urgently 17:2
use 38:12 43:14 59:14
  59:17

used 4:14,20 10:8 53:6
using 38:14
usually 12:14 36:9 55:1

V
Vader 53:6
various 26:7
vehicle 11:13 17:20
  33:18 54:13 58:5
  67:21 68:2
versus 5:9 22:11
very 8:11 9:20 24:8,18
  27:12 32:12,16,21
  33:16 43:14 69:2,21
  70:6
Vic 2:12
Videographer 2:12 5:5
  49:5,7,10 68:9,12,16
videotape 7:1
VIDEOTAPED 1:14
view 19:16
visit 34:4,11 35:7 37:21
  38:18,19 41:1 55:11
  58:11 59:3,5 72:12
  72:19
visits 30:16 57:13 58:9
vitae 3:3
vs 1:7 80:14

W
waive 7:8,10,11
waived 4:19 5:3 81:4
waiving 4:22
walk 39:8
walking 59:15
want 7:7,9 13:22 30:13
  44:10,11,17 45:3,16
  45:19 46:13,15,21
  69:4
wash 22:19
Washed 18:8
wasn't 33:6
watch 32:10
watching 41:23 43:20
way 19:14 42:10 46:10
  49:1 54:21 61:17
  62:15 63:18 77:7
  78:13
week 7:20
weeks 39:20,21 41:5,18
weight 33:5,9 38:1
  40:10,10,12 41:12
  42:19 44:1 52:16,17
  52:20 57:8 58:16
weight-bearing 55:14
  57:6 77:4
well 15:7,19 16:10
  17:13 18:7 21:19
  22:7,13 23:12 26:19

Deposition of N. Tucker Mattox, M.D.    Wilker vs. US Services    January 17, 2008

Page 8

| | | | |
|---|---|---|---|
| 29:6 31:13 32:15<br>33:16 34:15 39:15<br>43:5 45:16 46:6<br>50:19 52:21 55:12<br>60:23 61:11,14 62:7<br>63:15 64:3 65:10,18<br>70:12 71:11 75:12<br>76:3 77:3<br>**Wendy** 1:5 5:8 6:4,20<br>10:12 11:3 60:3<br>64:16 77:20 80:12<br>**went** 26:2<br>**were** 11:1 17:21 18:1<br>26:5 27:1,11,17<br>33:13 37:16 39:2,4<br>40:4,6,13 42:17 43:5<br>49:12,13 51:11,12,17<br>51:19,23 57:4 58:5<br>58:18 59:16 60:17<br>67:17 68:1 71:2<br>72:20 73:1 74:6<br>75:14 77:15<br>**we'll** 7:2 69:7<br>**we're** 5:17 6:23 18:20<br>23:13 46:6,7 51:9<br>54:4 68:12,16<br>**we've** 30:9 49:23 51:7<br>**wheelchair** 38:6<br>**When's** 59:1<br>**while** 29:4,23 54:4<br>57:16 60:10 72:6<br>77:16<br>**whole** 6:14 49:9 80:10<br>**Wilker** 1:5,5 5:8,9 6:4<br>6:20 10:12,15 11:3<br>11:10 16:11 30:2<br>33:22 40:18 51:3,23<br>52:7 53:13 54:8 55:8<br>58:9 60:3 61:6 64:16<br>69:14 71:5 73:3,16<br>73:21 75:3 77:20<br>78:10 80:12,12<br>**Willie** 1:9 5:10 80:15<br>**witness** 5:1,2 6:13 7:7<br>45:8 48:21 81:2<br>**witness's** 47:18<br>**words** 68:3<br>**work** 19:1 58:23 60:4,6<br>60:7,9 61:2 66:4 74:8<br>74:15<br>**working** 58:16,17<br>61:14<br>**worried** 33:13 37:3<br>**worse** 24:11<br>**worsening** 76:10<br>**wouldn't** 42:6<br>**wound** 14:21 18:9 37:4<br>39:1,15,17,19<br>**wounds** 31:4 41:8 | **wreck** 28:3 51:14,18<br>52:3 58:6 67:21 68:6<br>**write** 55:18 60:11<br>**written** 9:12 46:5<br>**wrong** 48:22 65:19<br>**wrote** 57:21<br><hr>**X**<hr>**x-ray** 13:5,6 20:9 41:23<br>76:10<br>**x-rayed** 33:20 34:4<br>**x-rays** 18:22 19:3,5,8<br>31:7,13 52:14 63:19<br>64:4,5,11<br><hr>**Y**<hr>**Yeah** 70:16<br>**years** 9:1,2,4,5,13<br>62:14,14 75:16,17<br>**Y'all** 7:21<br><hr>**$**<hr>**$12,995.15** 3:12<br>**$16,993** 65:7<br>**$17,236** 65:20<br>**$58,060.64** 3:8 66:13<br>**$6,648** 73:23<br>**$9,884.55** 3:9<br><hr>**#**<hr>**#66** 1:16 81:11<br><hr>**0**<hr>**07** 26:1 29:14,15 31:7<br>38:18 42:16 43:1,23<br>49:13,16 56:22 57:22<br>59:4 72:12 75:13<br><hr>**1**<hr>**1** 3:4 13:13,15,19 68:21<br>**1/18/07** 66:15<br>**1/25/07** 66:15<br>**1/29/07** 30:7<br>**1:15** 79:11<br>**10** 40:23 55:16 59:11<br>72:10,13 73:8<br>**11** 8:23<br>**12** 9:1,4,5 30:10<br>**12th** 38:19<br>**12,995.15** 67:12<br>**12:00** 1:21<br>**12:03** 5:21<br>**13** 3:4<br>**1400** 2:10<br>**154** 13:13<br>**17th** 1:20 5:17 10:15<br>11:4 26:1 29:14<br>80:22<br>**18th** 13:17 | <hr>**2**<hr>**2** 3:5 64:20 65:3,3,16<br>65:19 68:21<br>**2-A** 3:6 65:13,15,17<br>68:22<br>**2/1/07** 35:17<br>**2/5/07** 36:20<br>**2:07-cv-00232-MEF**<br>1:8 5:12 80:21<br>**20** 62:14 75:16<br>**20th** 2:10<br>**200** 1:19<br>**2000** 7:16<br>**2007** 10:16 11:4 13:17<br>30:19 37:20<br>**2008** 1:21 5:17 80:22<br>81:8<br>**2119** 1:19<br>**2193** 7:19,19<br>**23rd** 56:22<br>**241594** 2:6<br>**25th** 29:14<br>**26th** 43:1,23 49:13<br>**28th** 39:12<br>**29th** 30:19 31:7,8<br><hr>**3**<hr>**3** 3:7 66:8,11 68:22<br>**3A** 14:2 15:1 71:13<br>**3/5/07** 41:3<br>**30** 56:22 62:14 75:17<br>**30th** 81:8<br>**31st** 60:11<br>**35203-2626** 2:11<br>**36117** 2:5<br>**36124-1594** 2:6<br><hr>**4**<hr>**4** 3:9,10 66:21 67:1<br>68:22<br>**4/11/07** 52:8<br>**4/4** 49:16<br><hr>**5**<hr>**5** 3:11 40:23 67:8,11<br>68:22<br>**5th** 37:19 38:18 42:15<br>**5/2/07** 53:14<br>**5/23/07** 55:10<br>**505** 2:10<br><hr>**6**<hr>**6** 2:18<br>**6,648** 66:2<br>**6/13/07** 56:23<br>**64** 3:5<br>**65** 3:6<br>**66** 3:7,9,10<br>**67** 3:11 | **69** 2:19<br><hr>**7**<hr>**7.5** 40:23<br>**7/11** 58:11<br>**7/11/07** 58:10<br>**7030** 2:5<br>**76** 2:20<br>**78** 2:21 80:23<br><hr>**8**<hr>**8** 3:3<br>**8th** 57:22 59:3,4<br>**8/8/07** 58:10<br><hr>**9**<hr>**9** 2:5<br>**9,884.55** 67:2<br>**9-30-2008** 81:12<br>**90** 72:14 73:8<br>**96** 8:21 | |