IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| WENDY WILKER and MICHAEL WILKER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.:   2:07-CV-00232-MEF |
| U.S. SERVICES, LLC.; WILLIE MURRAY ROBINSON, et al., | ) ) ) | |
| Defendants. | ) ) | |

## RESPONSE TO PLAINTIFF'S MOTION TO COMPEL RESPONSES TO DISCOVERY REQUESTS

Comes now the Defendants, US Services, LLC and Willie Murray Robinson and for Response to the Motion to Compel filed by the Plaintiffs in this action on August 25, 2008(doc.90) says as follows:

1.   A.   Request for Production Number 2 states:

> "2.   Produce the accident register maintained as required in 49 CFR 390.15(b) to include the motor vehicle collision with Plaintiff and all accidents three years prior to January 17, 2007.

The Defendants produced the accident register showing the accident made the basis of this suit.  The Defendant takes the position that any other accident involving a driver other than Willie Murray Robinson is irrelevant, immaterial, and not calculated to lead to the discovery of admissible evidence. (See Exhibit A).

B.   Request for Production Number 5 seeks:

> "5.   Produce all leases and contracts that were in effect for the cab and trailer on the day of the accident."

The Defendants have produced the contract under the LTO arrangement.  There was no other written lease in effect but an exemplar has been provided to Plaintiff counsel on August 26, 2008.  (See Exhibit B and Exhibit F).

C.   Request for Production Number 13 states:

> "13.   Produce all logs-official or unofficial of Willie Murray Robinson for the six months before the collision and for thirty days after the collision."

The Defendant has produced driver's logs from January 1, 2007 through the date of the accident on January 17, 2007. Plaintiff waits over one year to file his Motion to Compel with respect to driver's logs after learning in the deposition of Wendy Amram, taken on July 18, 2008, that there are no other driver's logs. (Attached is Exhibit C as driver's logs and Exhibit D is testimony of Wendy Amram).

D.    Request for Production Number 28 states:

> "28.   Produce all policies including liability, general liability, excess umbrella for the tractor and trailer and any other insurance that will cover or arguably cover this collision."

The Defendants have produced the policy on August 26, 2008.

II    Plaintiffs' Supplemental Request for Production (filed June 30, 2008)

Request for Production Number 35 states:

> "35.   Please produce copies of all documents received by the Defendants, their attorneys, investigators, adjusters, or detectives, from any non-party including, but not limited to, any former or current employer of Wendy Wilker and any health care provider of Wendy Wilker."

The Defendants will not produce attorney client communication. With respect to the documents received from Ms. Wilker's current employer or any health care provider, the Defendants have produced such documents to the Plaintiff to the extent they were available. The documents that were received from Ms. Wilker's former employer were of no consequence and were lost. These documents are available for Plaintiff counsel to obtain very easily as Ms. Wilker can make a request for such documents. Plaintiff's attorneys have been advised to make a request but continues to file motions and waste the courts time when he could easily obtain these documents. This is simply an attempt by Plaintiff counsel posture in this case.

III.    Plaintiff's Supplemental Request for Production to Defendants (filed June 30, 3008) (Numbers 36 through 42)

The Defendants responded to the Plaintiff's Supplemental Request for Production on August 14, 2008 at 8:28 a.m. and on August 13, 2008 at 5:12 p.m. The response was forwarded again on August 26, 2008. (Attached as Exhibit E).

 s/Jack J. Hall, Jr.
Jack J. Hall, Jr., Attorney for Defendants,
US Services, LLC and Willie Murray
Robinson.


**OF COUNSEL:**

HALL, CONERLY & BOLVIG, P.C.
1400 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205)251-8143



## CERTIFICATE OF SERVICE

I hereby certify that I have on this 26th  day of August, 2008, served a true and correct copy of the above and foregoing pleading on counsel for all parties to this proceeding by electronic mail or by placing same in the U.S. mail, properly addressed and first class postage prepaid, to:


David E. Allred
DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594

Kenneth J. Mendelsohn
JEMISON & MENDELSOHN
1772 Platt Place
Montgomery, Alabama 36117


 s/Jack J. Hall, Jr.
OF COUNSEL



US SERVICES, LLC

ACCIDENT REGISTER

| 1/17/2007 | MURRAY ROBINSON | 9:30PM | US 80 | BURKESVILLE | AL | 0 | 0 | 1 | YES | 0 |

EXHIBIT

US Services Response to P's R's FP
Document Production re: Driver Logs, FRA Records, Etc.
0000032

**US SERVICES**
**205 TROUP STREET**
**DUBLIN, GEORGIA 31021**

THIS AGREEMENT, between _____ hereinafter called "Operator", and US SERVICES, LLC with principal offices in Dublin, Georgia, hereinafter called "Carrier", WITNESSETH:

1. EQUIPMENT. Operator hereby leases to carrier the motor vehicle equipment described in Schedule A to this agreement, which is hereinafter called the "Equipment." Operator warrants that he has legal possession and use of the Equipment and that the Equipment is and will be kept in good condition and in compliance with all applicable safety regulations. Carrier has the right to inspect the Equipment at any time.

**SCHEDULE A**
**Description of Equipment**

**TRACTOR**

| MAKE # | MODEL | YEAR | SERIAL NUMBER | LICENSE # AND STATE | WEIGHT | UNIT |
|--------|-------|------|---------------|---------------------|--------|------|
|        |       |      |               |                     |        |      |

**TRAILER**

| MAKE | YEAR | SERIAL NUMBER | LICENSE AND STATE | LENGTH | UNIT NUMBER |
|------|------|---------------|-------------------|--------|-------------|
|      |      |               |                   |        |             |

IN WITNESS WHEREOF, the parties have executed this agreement in triplicate, and Carrier hereby acknowledges receipt from Operator of the Equipment.

This _____ day of _____ at _____.

US SERVICES, LLC

Operator

_____

By _____

S.S. #

_____

_____

Federal I.D. No.

_____

Address:

_____

_____

Telephone: (____)

Blumberg No. 6119   EXHIBIT   B

# LONG-TERM EQUIPMENT LEASE AGREEMENT

THIS AGREEMENT, between _____ hereinafter called "Contractor/Operator", and US Services, LLC hereinafter called "Carrier" WITNESSETH:

1. EQUIPMENT. Contractor/Operator hereby leases to Carrier the motor vehicle equipment described in Schedule A to this agreement, which is hereinafter called the "Equipment." Contractor/Operator warrants that he has legal possession and use of the Equipment and that the Equipment is and will be kept in good condition and in compliance with all applicable Federal and State safety regulations. Carrier has the right to inspect the Equipment at any time. Contractor/Operator and Carrier specifically agree that Contractor/Operator shall remain in possession with ownership of the vehicle, and this lease to Carrier shall be a lease onto Carrier's Department of Transportation Motor Carrier Authority.

2. TERM. This Lease shall commence with the date of its execution, and it shall continue for a period of twelve (12) months, or earlier if terminated as provided herein. Upon expiration of this term, this agreement shall renew for an additional twelve (12) months, unless otherwise terminated as provided herein. This renewal process shall continue for this agreement until terminated as provided herein. The Lease may be terminated after the first 30 days at any time at the option of either party upon 10 days written notice to the other party. Upon termination of this agreement with or without cause and regardless of who initiates the termination, Lessor will not for a period of twelve (12) months after such termination, directly or indirectly, with for himself or form and entry, self or other for sale, canvass, solely deliver or offer such services as are offered by Lessee carrier to any of the customer or account of carrier.

3. POSSESSION AND USE. Operator shall have the exclusive possession and use of the Equipment and Operator shall use the Equipment exclusively for Carrier.

4. DRIVERS. Contractor/Operator shall provide drivers and any required helpers, and they shall be exclusively the employees of Contractor/Operator. Drivers will be properly licensed and otherwise qualified to operate the Equipment. They shall (a) comply with all Federal and State laws and regulations governing operation of the Equipment, (b) take such tests as may be prescribed by Carrier, and (c) cooperate in such safety and training programs as may be administered by the Carrier. Contractor/Operator shall furnish to Carrier certificates of physical examination, drivers' logs, copies of workers compensation Insurance policies, and any other documents of information which may be reasonably required. Noncompliance with this paragraph will give Carrier the right to terminate this Lease without notice.

5. COMPENSATION. Carrier will pay to Contractor/Operator as full payment for the rental, use and maintenance of the equipment, an amount to equal .85/mi (eighty-five cents per mile) loaded, and .75/mi (seventy-five cents per mile) unloaded, or .80/mi (eighty cents per mile) roundtrip. Drivers being paid on a percentage basis shall be paid 70% (seventy percent) of the line haul revenue. Drivers will also be paid any fuel surcharge pursuant to Exhibit B and Exhibit C attached hereto.

Where the Equipment is used in lease-interchange operations with other carriers, or another company's truck or another Contractor/Operator truck, picks up a loaded trailer/container at a shipping/loading point and delivers same to a terminal or yard of Carrier (referred to herein as

a "Dray"), all payments made to such other carriers, company or Contractor/Operator, in connection with that use or delivery, will be deducted from the gross revenue derived in order to determine final net transportation revenue for this purpose. Should Carrier perform the Dray, then Carrier shall deduct from the gross revenue owed the Contractor/Operator the following Dray charges: Charleston-based Dray- **$35.00;** Savannah-based Dray- **$25.00;** Atlanta and Norfolk-based Drays- **as paid by Carrier to company or individual performing the Dray.** Detention shall be paid to Contractor/Operator at the rate of **$40.00** per hour after two hours of qualifying detention.

It is expressly understood that Carrier does not guarantee Contractor/Operator any amount for freight for transportation during any period of time. Carrier and Contractor/Operator also agree that Contractor/Operator will ONLY be paid through electronic funds transfer, so Contractor/Operator warrants that they have or will have a valid US bank account.

6. PAYMENT. Payment of compensation shall be made to Contractor/Operator on a day selected by Carrier which shall be with 15 calendar days after receipt by Carrier at its general office of the following documentation relating to the services for which payments is to be made:

   (a) Signed delivery receipt(s)
   (b) Completed drivers' logs
   (c) Appropriate weight tickets
   (d) Any specific documents, required by the shipper(s) in question
   (e) Any in/out interchange from the pick-up/drop-off facility (i.e. port, railhead, designated container yard, etc.)
   (f) Copies of permits, if applicable
   (g) Receipts for expenses advanced for which reimbursement by Carrier is claimed
   (h) Inspection reports and lease-interchange receipts
   (i) VCR inspections per trip when applicable

It is agreed that Carrier shall be allowed to deduct from any Monies due to Contractor/Operator any cost or changes incurred as a result of the Contractor's/Operator's failure to submit to the Carrier items of documentation required by, but not limited to those required by the Federal Department of Transportation, the interstate Commerce Commission or any state regulatory agency or Department of Revenue and documentation required by Carrier.

Contractor/Operator shall deliver to Carrier a signed delivery receipt(s) or proof of delivery within three (3) days of the manifest shipping date. If Contractor/Operator fails to deliver such documentation with said time, Carrier shall deduct from any payments or compensation due hereunder to Contractor/Operator, the sum of $50 per each load on which Contractor/Operator fails to provide said documentation.

All deductions shown on Contractor's/Operator's final trip settlement check for any item(s) including, but not limited to, deductions for advances, insurance, worker's compensation, Maintenance, fuel tax, etc...shall be presumed to be correct and accurate and shall constitute an account stated binding on the Contractor/Operators unless, within thirty (30) days after receipt thereof by Contractor/Operator, the Contractor/Operator shall deliver to Carrier within objection thereto specify the error(s) contained in any such trip settlement check; provided, however, that the Carrier shall have the right at any time to correct such final trip settlement check and deduct and such additional charges from any payment due to the Contractor/Operator. Carrier shall not be required to provide any documentation whether original, copies or otherwise un support of the deductions noted on the Contractor's/Operator's final trip settlement check after thirty (30) days from receipt of said check by Contractor/Operator.

7. FREIGHT BILL. Carrier shall give Contractor/Operator a copy of each extended freight bill covering the transportation services on which compensation is based before or at the time of payment for those services. Carrier has the right, however, to delete from those freight bills the names of shippers and consignees. On request of Contractor/Operator, Carrier shall make reasonable arrangements for Contractor/Operator to examine Carrier's tariffs.

8.  EXPENSES

8.1 Contractor/Operator is responsible for payment of:

> (j)  All expenses of operation of the Equipment, including, but not limited to, fuel, lubricants, tires, repairs, parts, supplies, base and prorated plates and licenses, State registration decals, fuel taxes, mileage taxes, highway taxes, weight tickets, permits of all kinds, fines, penalties, ferries and tolls. Should any municipal, state or federal government agency or authority audit Carrier for tax purposes, including but not limited to fuel and mileage tax purposes, with such audit(s) being based on fuel reports, mileage reports or other reports filed by the Contractor/Operator will be responsible for payment or reimbursement of the tax reports filed by the Contractor/Operator.
>
> (k)  drivers' and helpers' compensation, including, but not limited to overtime bonuses; expenses; and contributions to pension, welfare or other benefit plans;
>
> (l)  payroll and unemployment taxes and contributions;
>
> (m)  detention and accessorial services; and
>
> (n)  cargo loading and unloading charges and expenses, except where it is clearly specified on the bill of lading that shipper or consignee is responsible therefore.

9.  INSURANCE AND RESPONSIBILITY

9.1 Carrier shall provide public liability and cargo insurance covering the Equipment in at least the minimum amounts required by the Interstate Commerce Commission and applicable Federal and State laws, and such insurance shall be for the protection of Carrier at all times during which the Equipment is in the service of Carrier, on an authorized dispatch, or returning from a delivery.

9.2 Contractor/Operator shall provide at Contractor's/Operator's sole expense any workers compensation insurance which might be required by law. (It is understood that Contractor/Operator is an independent contractor and not an employee of Carrier. As an independent contractor, Contractor/Operator may be considered an employer who is required to provide worker's compensation insurance coverage. If Contractor/Operator is required by law to provide worker's compensation insurance coverage and fails to do so, Contractor/Operator shall indemnify and hold carrier harmless against and all loss, damage or liability incurred by Carrier (including reasonable attorney's fees and Court costs) by reason of Contractor's/Operator's failure to secure or provide such coverage.

9.3 During all other times, including bobtail operations, Contractor/Operator shall provide public liability and property damage insurance covering the Equipment. Contractor/Operator shall provide at all times fire, theft and collision insurance on the Equipment and will hold Carrier harmless from all liability for the loss of, or damage to, the Equipment, without regard to the cause of such loss or damage. Contractor/Operator specifically warrants and agrees that any time they are in their vehicle (be it commercial- i.e. truck tractor- or personal) to or from their home, without a load ("bobtailing"), Contractor/Operator and Carrier shall deem Contractor/Operator to be bobtailing and not under the duty and control of the Carrier, and Contractor/Operator agrees, further, that at such times, he/she shall not be acting as agents, contractors or employees of the Carrier.

9.4 Contractor/Operator is responsible for (a) any damage, except normal wear and tear, or theft to any equipment Carrier which may be used or operated by Contractor/Operator and (b) any damage or theft caused by Contractor/Operator to any other equipment, including leased equipment, of Carrier.

9.5 Contractor/Operator is responsible for and will indemnify and pay to Carrier any liability or damage incurred as a result of any insurance deductible amount and any amounts not covered

by insurance payments both as to public insurance and property damage liability insurance.

INSURANCE DEDUCTIBLES

This limits your deductible to:

$1,000.00 Liability due to accident

$1,500.00 for Damage to Company trailers

$1,000.00 for Damage to cargo due to an accident

$2,000.00 for Damage to Containers/Interchange Trailers

9.6 Contractor/Operator is responsible for and will indemnify carrier against all cargo loss or damage liability due to pilferage, spoilage, or any other cause, resulting from the operation of the Equipment, whether or not caused or contributed to by the negligence of Contractor/0perator.

9.7 Carrier may deduct from the compensation payable hereunder all obligations of Contractor/Operator arising under the paragraph. Carrier must, however, deliver to Contractor/Operator a written explanation of such deductions before they are made.

10. PURCHASES  Contractor/Operator is not required to purchase or rent any products, equipment, or services from Carrier as a condition of entering this Lease.

11. CLAIMS Contractor/Operator shall promptly report to Carrier any accidents, claims, losses or damages of any kind which involve the Equipment or any cargo carried therein and shall provide Carrier with written reports, affidavits, or other assistance as may be necessary to adjudicate or settle all such claims.

12.    MAINTENANCE ACCOUNT

MAXIMUM  $1,000.00

1. Contractor/Operator shall pay to Carrier, or Carrier shall withhold from the compensation due Contractor/Operator, the amount of $50.00 (fifty dollars) per week, hereinafter called the "MAINTENANCE." This is a no draw account that Contractor/Operator may borrow money against during the term of this agreement. Any such loan made by Carrier to Contractor/Operator is at Carrier's sole discretion and shall be limited to the amount accrued in Contractor/Operator's account. No interest shall be paid on this account, and Contractor/Operator expressly waives any interest payments that may be required by state or federal statute. Contractor/Operator specifically acknowledges that the consideration for this waiver is Contractor/Operator's ability to receive rapid loans from this account.

2. The Maintenance shall be held by Carrier to guarantee performance by Contractor/Operator and to cover all

(a) payments and advances made by Carrier to or on behalf of Contractor/Operator;

(b) indebtedness of Contractor/Operator to Carrier arising under the responsibility and indemnity provisions of paragraph 9; and

(c) other amounts which Contractor/Operator shall owe Carrier as a result

of operations conducted under this Lease.

3.  During the term of Lease, Carrier shall provide Contractor/Operator with a monthly account of all transactions involving the Maintenance and shall provide such additional accounting as Contractor/Operator may request.

4.  Upon termination of this Lease, Carrier shall deduct from the Maintenance all obligations incurred by Contractor/Operator under this Lease and shall within 45 days after termination provide a final accounting and return the balance of the Maintenance to Contractor/Operator. The conditions which Contractor/Operator must fulfill in order to have the Maintenance returned are

(a) removal of *all **identification** of Carrier* from Equipment;
(b) return to Carrier of all signs permits, decals, plates, and other documents and property belonging to Carrier within five business days of termination; and
(c) execution of an appropriate release.

After final settlement has been made, any charges which may arise or become due and which are the responsibility of Contractor/Operator under this lease, will become the liability of the Contractor/Operator.

14.    COLLECTIONS AND REMITTANCES  In the event Contractor/Operator is required to collect monies due Carrier for transportation of commodities, Contractor/Operator will collect the same in cash or by certified check or money order payable to the Carrier together with any and all charges arising out of or in connection with transportation in accordance with the bill of lading, shipping contract, or other written instructions covering each shipment transported hereunder.

Contractor/Operator will remit all collected monies together with properly signed bills of lading and inventories to Carrier no later than seventy-two (72) hours after making collection. Contractor/Operator is not authorized to extend credit or make any adjustments in any of the terms of collection except upon prior written authorization from Carrier. Contractor/Operator agrees that no shipments hereunder will be delivered until all C.O.D. charges have been collected in cash, certified check, or money order unless otherwise instructed by Carrier. Any loss resulting from theft, default, or failure by drivers or other employees of Contractor/Operator relative to the return of transmittal of monies so collected shall be borne solely by Contractor/Operator. Contractor/Operator or Contractor/Operator's drivers who fail to remit C.O.D. charges will have the full amount of the C.O.D. deducted from Contractor/Operator trip settlement.

15.    CONTRACTOR'S OPERATOR'S FAILURE TO PERFORM  If Contractor/Operator violated this Lease in such a manner as to fail to complete transportation of commodities in transit or abandons the

shipment or otherwise subjects Carrier to liabilities,  Contractor/Operator  expressly agrees that Carrier

shall have the right to temporarily take possession of the Equipment and to complete the trip involved

to reduce or limit Carrier's liabilities. Additionally, violation of this Lease by Contractor/Operator shall give Carrier the option immediately to cancel the same. Contractor/Operator hereby waives any

recourse against Carrier for such action and agrees to reimburse Carrier for any cost and/or expenses

arising out of completion of such trip(s) and to pay Carrier any damages for which Carrier may be liable to shipper or others arising out of such violation of this agreement by Contractor/Operator. Upon

completion of such trip(s) the Equipment shall be returned to the possession of Contractor/Operator at

the point of origin of the shipment for which the violation took place or at one of the Carrier's offices

or terminals.

16.    OTHER PROVISIONS  Carrier acquired by this lease no ownership for title in the Equipment other than the lease-hold interested created by this Lease. It is the intention of the parties to establish an independent contract relationship, and nothing in this Lease is intended to constitute Carrier an employer of Contractor/Operator or his drivers and helpers. While Carrier shall ultimately determine and control the transportation service to be performed under this Lease, it is contemplated that Contractor/Operator shall exercise individual discretion and control over the means of performance best suited to accomplish that end result, subject only to the necessity of complying at all times with applicable laws and regulations.  Neither Carrier nor Contractor/Operator is the agent of the other, and neither party shall bind or have the right to bind the other by contract or otherwise, except as specified in this Agreement.

If any provisions of this agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to each provision and shall not in any way effect or render invalid or unenforceable any other provision of this agreement, and this Agreement shall be carried out as if such invalid or unenforceable provision were not contained herein.

17.    CHOICE OF LAW AND VENUE It is the intention of the parties hereto that this Lease and the performance hereunder and all suits and special proceedings hereunder be constructed in accordance with and under and pursuant to the laws of the State of Florida and that in any action, special proceeding or other proceeding that maybe brought arising out of, in connection with, or by reason of this Lease, the Laws of the State of Florida shall be applicable and shall govern to the exclusion of the law of any forum. To induce Carrier to accept this Agreement, Contractor/Operator irrevocably agrees that subject to Carrier's sole discretion, all actions and proceedings in any way, manner or respect, arising out of, from or related to this agreement shall be litigated in Courts which have sites in Seminole County, Florida. Contractor/Operator hereby consents and admits to the jurisdiction of any local, state, or Federal court located within said county and state.  Contractor/Operator hereby waives any right he or she may have to transfer to change the venue of any litigation brought against Contractor/Operator or by the Carrier in accordance with this paragraph.

18.    RETURN OF CARRIER OWNED PROPERTY UPON TERMINATION  Contractor/Operator's failure to return to Carrier placards, fuel permits, PSC permits, and any document issued to the Contractor/Operator by the Carrier within seven (7) days following termination date of the long-term equipment will result in the Carrier deducting from the Contractor/Operator a sum not to exceed five hundred dollars ($500.00).

Upon the termination of this Lease, Contractor/Operator shall return to Carrier at its office at _____ all of the Carrier's Equipment being utilized by Contractor/Operator including, but not limited to, Carrier's trailer(s). Should Contractor/Operator fail to promptly return such equipment, Contractor/Operator shall pay to Carrier all expenses incurred in returning such equipment to Carrier's office located at Winter Springs, Florida.

19.    SURCHARGE   Carrier's payment of any fuel surcharge shall be remitted pursuant to Exhibit B for Contractor/Operators paid under the mileage rates, and Exhibit C for Contractor/Operators paid under a percentage rate.

# Additionally, by signing this Agreement, you make a commitment to promoting safety every day.

IN WITNESS WHEREOF, the parties have this agreement in triplicate,

This, _____ day of, _____ at _____.

By:_____          Operator:
_____

Name and Title: _____          Social Security No.:
_____

For US Services, LLC          Federal Id No.:
_____

Address:
_____

City: _____ State: _____



01-01-07 AND 01-02-07
MONDAY     TUE
OFF   DUTY

FAK

USE TIME STANDARD AT HOME TERMINAL
© Copyright 2005 & Published by J. J. KELLER & ASSOCIATES, INC.

EXHIBIT
C







DRIVER'S DAILY LOG
Form 0601-601-LD (Rev. 8/05)
(24 HOURS)

Please Print Clearly Within the Boxes

01-05-07

CARRIER: U.S. SERVICES   ATLANTA, GA
NAME &
ADDRESS: Jonesboro RD.

Tractor Number

R1005

Driver's ID / Code

8023

Co-Driver's ID / Code

Driver's Name: Willie Murray Robinson

TOTAL HOURS: 24 0.0

REMARKS

OFF DUTY   FRI - 01-05-07
"    "   SAT - 01-06-07
"    "   SUN - 01-07-07

24

Original File at home terminal
Duplicate Driver retains in his/her possession for eight days

USE TIME STANDARD AT HOME TERMINAL
© Copyright 2005 & Published by J. J. KELLER & ASSOCIATES, INC.





01-09-07

R1005

2633622

8023

U.S. SERVICE / ATLANTA, GA
JONESBORO, RD.

FAK TRLU 2633622 / TR22 204181

**Original** File at home terminal
**Duplicate** Driver retains in his/her possession for eight days

USE TIME STANDARD AT HOME TERMINAL
© Copyright 2005 & Published by J. J. KELLER & ASSOCIATES, INC.

US Services Response to P's R's FP
Document Production re: Driver Logs, FRA Records, Etc.
0000038



Driver's Daily Log

Date: 01-10-07

Tractor Number: RT005

Carrier Name & Address: U S SERVICE  ATLANTA GA JONESBORO RD

Driver's Signature: Wittie M. Robinson

Driver's ID / Code: 8623

TOTAL HOURS: 24  0 0

24

REMARKS

OFF  DUTY  01-10-07
        "        01-11-07
        "        01-12-07
        "        01-13-07
        "        01-14-07

Original file at home terminal
Duplicate Driver retains in his/her possession for eight days

USE TIME STANDARD AT HOME TERMINAL
© Copyright 2005 & Published by J. J. KELLER & ASSOCIATES, INC.







**MERRILL LEGAL SOLUTIONS**
Court Reporting * Legal Videography * Trail Services

Page 1

1

2           UNITED  STATES  DISTRICT  COURT

3          MIDDLE  DISTRICT  OF  ALABAMA

4                 NORTHERN  DIVISION

5

6

7    WENDY  WILKER  and

8    MICHAEL  WILKER,

9

10      Plaintiffs,

11                               CASE  NO.

12    VS.                    2:07-CV-232  MEF

13

14    US  SERVICES,  LLC,

15    WILLIE  MURRAY  ROBINSON,

16    et  al.,

17

18      Defendants.

19                                      EXHIBIT

20                                         D

21      DEPOSITION  OF:

22

23      WENDY  AMRAM  COPY

Page 2

1

2                          STIPULATIONS:

3

4

5        IT IS STIPULATED AND AGREED by

6    and between the parties through

7    their respective counsel that the

8    deposition of WENDY AMRAM may be

9    taken before Jennifer Lee, Notary

10   Public, State of Alabama at Large,

11   at the law office of Hall, Conerly &

12   Bolvig, Suite 1400, Financial

13   Center, 505 North 20th Street,

14   Birmingham, Alabama, on the 18th day

15   of July, 2008, commencing at

16   approximately 1:00 p.m.

17

18       IT IS FURTHER STIPULATED AND

19   AGREED that the signature to and the

20   reading of the deposition by the

21   witness is waived, the deposition to

22   have the same force and effect as if

23   full compliance had been had with

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trail Services

Page 40

1      A.  What we had on file, yes.

2      Q.  Okay.

3      A.  But if we did not have them on

4   file.

5      Q.  All right.  So at the time of

6   the wreck then since you are

7   required by DOT to keep them back

8   six months, should I infer from that

9   that you had back six months from

10  January 17th; is that correct?

11     A.  Yes.  We should have.

12     Q.  From January 17th of '07, you

13  would have had back six months from

14  that date when the wreck happened

15  and when you found out about it; is

16  that right?

17     A.  Should have, yes.

18     Q.  All right.  And then you found

19  out about the wreck within -- and

20  I'll ask you some more details about

21  that.  But within a short time after

22  the wreck, you knew about it and US

23  Services knew about it; is that

MERRILL LEGAL SOLUTIONS
Court Reporting * Legal Videography * Trail Services

Page 41

1    right?

2      A.  Yes, sir.

3      Q.  And then after that, the

4    logbooks that you had wound up

5    getting shredded; is that correct?

6      A.  Yes.  The person that was over

7    the logs didn't keep them.

8      Q.  Okay.  And neither you or

9    anybody from US Services asked them

10   do not shred Willie Murray

11   Robinson's logbooks, he's had a

12   wreck, this lady is hurt, we may

13   need them?  Nothing like that

14   occurred?

15     A.  Not that I know of.

16     Q.  Okay.  It is my understanding

17   that Mr. Robinson claims that he is

18   a lease/operator with US Services;

19   is that your understanding?

20     A.  Yes, sir.

21     Q.  And we had asked for in some of

22   the earlier document requests, we

23   asked for a copy of the

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

WENDY WILKER and MICHAEL )
WILKER, )
     )
       Plaintiffs, )
     )
vs. )      Case No.:   2:07-CV-00232-MEF
     )
U.S. SERVICES, LLC.; WILLIE )
MURRAY ROBINSON, et al., )
     )
       Defendants. )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL REQUEST FOR PRODUCTION

Comes now the Defendants and for Response to Plaintiff's Supplemental Request For Production says as follows:

36.   A copy of all documents, loan agreements, memoranda regarding loans or advancements to Willie Murray Robinson from US Services, LLC, concerning:

     (a)    The "David burgundy volvo" referred to in the deposition of Willie Murray Robinson; and

     (b)    The "RTO" or "LTO" arrangement referred to page 61 of Willie Murray Robinson's deposition as "...a contract for lease-purchase for 82 weeks at 250 per week..." See an exemplar of documents utilized by Defendant US Services with other drivers concerning a "RTO" or "LTO" arrangement concerning the purchase of trucks.

**ANSWER:**    Attached

37.   A roster of all drivers with US Services who Defendant US Services contends have a "owner-operated lease agreement" as referred to page 10, line 13 of Adam Jackobson's deposition.

**ANSWER:**    Objection. Irrelevant, immaterial and not calculated to lead to the discovery of admissible evidence.

38.   The attendance roster for all safety meetings or driver meetings attended by Willie Murray Robinson as require by US Services.

EXHIBIT
E
Blumberg No. 5119

**ANSWER:**    These documents were produced at the deposition of Wendy Amram.

39.    The policy, procedures, and requirements of Defendant US Services for retention or termination of drivers regarding the number of accidents and tickets as referred to on pages 12 and 13 in the deposition of Adam Jacobson.

**ANSWER:**    These documents have been produced in response to the original Request For Production.

40.    An exemplar of the lease which Defendant US Services:

    (a)    Contends was the "original lease" between Robinson and US Services; and

    (b)    Is the "same exact lease" referenced by Adam Jacobson as the "same exact lease" and which"... should have been provided at some point...".

**ANSWER:**    (a)    Not available.

        (b)    To be provided once located.

41.    All leases, contracts, or agreements between Willie Murray Robinson and US Services as of the date of the defendants' responses to these supplemental requests for production.

**ANSWER:**    None.

42.    Supplemental responses to the Plaintiffs' requests for production filed May 2, 2007, to which the Defendants produced documents to the plaintiffs on December 27, 2007, although Defendant US Services' response states that it is dated August 20, 2007.

**ANSWER:**    None.

                                  s/Jack J. Hall, Jr.
                                    Jack J. Hall, Jr., Attorney for
                                    Defendants, US Services, LLC and
                                    Willie Murray Robinson.

**OF COUNSEL:**

HALL, CONERLY & BOLVIG, P.C.
1400 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205)251-8143

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 13th day of August, 2008, served a true and correct copy of the above and foregoing pleading on counsel for all parties to this proceeding by electronic mail or by placing same in the U.S. mail, properly addressed and first class postage prepaid, to:

David E. Allred
DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594

Kenneth J. Mendelsohn
JEMISON & MENDELSOHN
1772 Platt Place
Montgomery, Alabama 36117

s/Jack J. Hall, Jr.
OF COUNSEL

## Melissa Williams

| | |
|---|---|
| **From:** | Melissa Williams |
| **Sent:** | Thursday, August 14, 2008 8:28 AM |
| **To:** | dallred@allredpclaw.com |
| **Cc:** | Jack Hall, Jr |
| **Subject:** | FW: |
| **Attachments:** | Wilker 08-13-08.pdf |

---

**From:** Melissa Williams
**Sent:** Wednesday, August 13, 2008 5:12 PM
**To:** 'dallred@pclaw.com'
**Cc:** Jack Hall, Jr
**Subject:**

**Melissa Williams**

| | |
|---|---|
| **From:** | Melissa Williams |
| **Sent:** | Wednesday, August 13, 2008 5:12 PM |
| **To:** | dallred@pclaw.com |
| **Cc:** | Jack Hall, Jr |
| **Attachments:** | Wilker 08-13-08.pdf |

## US SERVICES RENTAL AGREEMENT
## STANDARD TERMS AND CONDITIONS

This Rental Agreement is entered into by US Services, LLC (hereinafter referred to as "USS"), a Florida Corporation residing at 351 E SR 434, Winter Springs, FL in Seminole County, and WILLIE ROBINSON (hereinafter referred to as "Renter"), whose address is *Willie Murray Robinson*, *P O, BOX 115135* *ATLANTA, GA, 30310-8135*, collectively referred to as the "Parties").

In consideration of the mutual covenants contained herein the Parties intending to be legally bound do hereby agree as follows:

1.  RECEIPT OF USS EQUIPMENT in good repair and working condition is acknowledged by Renter upon acceptance of delivery and/or execution of this short term Equipment Rental Agreement form by Renter. As used herein, Equipment refers to the equipment identified as follows:

    *Replaced by USS 116*

    Make: VOLVO          Year: 1998
    VIN: 4VGWDAJH5WN748870

    Renter shall have a possessory interest in the Equipment and the right to use the Equipment as if he were the owner, but USS shall at all times during the Rental Period have a superior possessory interest to the Equipment [to that of Renter] and title shall remain with USS until the Purchase Option is exercised by Renter.

2.  USE CHARGES are defined as any and all payments that are required to be made by Renter to USS arising from the use or operation of any Equipment leased by USS to Renter. Renter shall pay to USS, or shall cause USS to be paid through US Services, LLC (*see below*) ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ ░░░░░░░░░░ (such eighty week period is hereinafter referred to as the "Rental Period". Use Charges are based on a weekly billing period unless otherwise specified. In the event of redelivery of the Equipment to USS prior to the expiration of the billing period in effect at the time of redelivery, Use Charges for the final partial billing period shall be adjusted to the appropriate weekly or daily rate, as applicable. Use Charges payable by Renter for each day (including Saturdays, Sundays, and holidays) during which Equipment is in the possession or control of Renter- shall commence on the date the Equipment is available for delivery to or pickup by Renter or its agent and shall continue until such Equipment is redelivered to USS at the required location in the same condition as when received or until the conclusion of the Rental Period. Should Renter complete his obligations for the entire term of the Rental Period, then he shall have the option of purchasing the Equipment for one dollar ($1.00) from USS (hereinafter referred to as the "Purchase Option").

    All payments shall be made in U.S. currency to the address as directed by USS. Overdue payments may be increased by a monthly service charge equal to the greater of the maximum rate permitted by law or 18% per annum. If Renter provides USS with a check,

*W.M.R. JR*
Renter

1

*hb*
USS



EXHIBIT
F
Blumberg No. 5119

pre-authorized payment, electronic payment, or any other form of payment that is returned due to insufficient funds, or payment is otherwise declined, the Renter shall be subject to an additional processing fee equal to $100.00. The specific Unit of Equipment covered by this Rental Agreement, as well as the delivery/pickup date and the termination date of such Unit, shall be set forth on the Schedule A attached hereto and on USS' monthly invoices which are incorporated herein by reference.

3. AS A CONDITION precedent to USS entering into this Equipment Rental Agreement and to USS delivering the Equipment to Renter, and as security for its full performance by Renter of its obligations hereunder, USS shall require Renter to operate the Equipment solely and exclusively as an independent contractor for US Services, LLC (MC# 407574, DOT# 951224), whose terminal is located at 1095 S. River Industrial Parkway, Atlanta, GA 30315. USS maintains and Renter acknowledges that this requirement, as well as any other provision in this Rental Agreement that is deemed to be a restriction, is in consideration for USS' relative lack of security in regards to this Rental Agreement. Renter further acknowledges that but for this condition, such a Rental agreement would not be available to Renter, and the benefits Renter shall derive and enjoy from this Rental Agreement will not be available to Renter unless this condition has been met.

4. CONDITION OF EQUIPMENT shall be maintained by Renter at Renter's expense and Renter shall redeliver all Equipment to USS in the same condition as when received. In order to ensure that the Equipment is maintained in serviceable/adequate condition the following Maintenance Program must be adhered to by Renter. Renter shall pay to USS, or shall cause USS to be paid through US Services, LLC (*see below*), eleven cents ($0.11) per mile or a minimum of one hundred and fifty dollars ($150.00) per week, whichever is greater, during the entire term of the Rental Period. All costs for this maintenance will be paid directly by USS and charged back against the Maintenance Fund. This Maintenance Program and Fund shall only apply during the Rental Period.

USS shall provide a detail of the Maintenance Program (i.e. lubrication, filters, seals, tires, etc.) that is to be followed by Renter precisely as prescribed by USS in the Maintenance Program Addendum (attached hereto). USS shall then pay or cause to be paid all maintenance bills from Renter's Maintenance Fund. If the Rental Period is not completed by Renter, then a tire allowance will be deducted from Renter's Maintenance Fund based on the miles driven by the Renter at the rate of one point eight cents (1.8¢) per mile. At the end of the Rental Period, or when either Renter or USS terminates this Rental Agreement, the Maintenance Fund shall be returned to the Renter less any applicable charges (i.e. scheduled maintenance, tire charges, etc.) and, should Renter successfully complete the Rental Agreement and exercise his purchase option, one thousand dollars ($1,000.00) necessary for US Services Maintenance Account (as defined in the US Services' Owner-Operator Agreement). With respect to any Equipment redelivered to USS in damaged condition, Renter shall be liable, to USS for the full cost of any such repairs, including any necessary drayage charges. It is understood that the Maintenance Fund and the Maintenance Account are two separate accounts independent from one another.

For the purposes of this Rental Agreement, the terms "maintenance" and "repairs" shall

Renter

2

USS

be defined as any repair necessary to maintain the functional performance of the Equipment. These terms shall not include any cosmetic or comfort-related repairs to the Equipment. If there are insufficient funds in the Maintenance Fund to cover a repair, then any repairs made to the Equipment shall be made at USS's sole discretion.

USS again maintains and Renter again acknowledges that this requirement, as well as any other provision in this Rental Agreement that is deemed to be a restriction, is in consideration for USS' relative lack of security in regards to this Rental Agreement. Renter further acknowledges that but for this condition, such a Rental agreement would not be available to Renter, and the benefits Renter shall derive and enjoy from this Rental Agreement will not be available to Renter unless this condition has been met. Renter may terminate this agreement at any time with no future obligations owed beyond the amount owing for which Renter has used the Equipment.

5.  IN CASE OF TOTAL LOSS of a Unit of Equipment by theft, confiscation, fire, destruction, damage beyond economic repair or any other total casualty, Renter shall pay USS the Stipulated Loss Value, of such Unit of Equipment which shall be equal to either the fair market value, or USS' book value of such Unit, as of the first day of the month of such loss or casualty, whichever is greater. USS reserves the right to determine whether a Unit of Equipment has in fact suffered an event of total loss or damage beyond economic repair.

6.  NO WARRANTY, EXPRESS OR IMPLIED, IS MADE BY USS OF THE QUALITY OF DESIGN OR MANUFACTURE OF THE EQUIPMENT. Renter waives any and all claims against USS for any and all loss or liability resulting from any defects or failures of design or materials of the Equipment, either latent or patent.

7.  IN NO EVENT WILL USS or its licensors be liable for any lost profits, loss of use, or for any consequential, unspecified, incidental or punitive damages of any kind, whether or not occasioned by the negligence of USS or its licensors. In no event will USS's total liability to Renter exceed the amount of Use Charges paid by Renter.

8.  RENTER HEREBY AGREES TO INDEMNIFY USS and hold USS harmless from and against any and all loss or liability (including reasonable attorneys' fees) for injuries or damages to any person or property arising out of or incident to the use, possession, maintenance or control of the Equipment by Renter. This Indemnification provision shall survive the termination of this Rental Agreement.

9.  INSURANCE covering the Equipment shall be maintained by Renter, at Renter expense, shall be procured only through USS, and shall include:

(a) All risk insurance covering physical loss of or damage to the Equipment from any cause whatsoever. USS shall be named a loss payee;

(b) Comprehensive Automobile Liability coverage protecting USS from and against all loss and damage it may sustain or suffer because of death of or injury to any person, as a

Renter                                      3                                      USS

result of the use, possession, maintenance or control of the Equipment by Renter. Coverage must include minimum limits of $1 million combined single limit or $1 million bodily injury and $250,000 property damage. USS must be shown as an additional insured; and

(c) Comprehensive General Liability coverage protecting USS from and against all loss and damage it may sustain or suffer because of death of or injury to any person, or damage to the property of any person, as a result of the use, possession, maintenance or control of the Equipment by Renter. Coverage must include minimum limits of $1 million general aggregate or $1 million each occurrence and include contractual coverage for hold-harmless agreements. USS must be shown as an additional insured.

(d) Workmen's Compensation Insurance coverage (Work Comp Coverage) that meets all applicable state and Federal Statutes mandated coverage requirements for Employers and/or DOT-licensed motor carriers. Coverage must include minimum limits set by any and all applicable state and Federal requirements for Employers and/or DOT-licensed motor carriers. USS must be shown as an additional insured.

Policies of Insurance shall be valid and in force, until the Equipment is redelivered to USS and shall be issued by Insurers acceptable to USS. Renter will provide USS either certificate(s) of insurance evidencing the required coverage prior to delivery or acceptance of any Equipment. Such certificates shall contain a requirement that USS receive thirty (30) days prior written notice of cancellation or material change.

Renter hereby acknowledges that the benefits of the insurance coverage procured through USS will not be available to Renter unless each of the following conditions have been met: (a) all loss or damage to the Unit of Equipment must have occurred in the United States, and such damage or loss was not the result of Renter's negligence and/or failure to maintain proper care and control of such Unit of Equipment; (b) Renter shall have promptly notified USS in writing of any loss or damage to any Unit of Equipment as soon as so practicable, and in any case, no later than 72 hours after discovery of such loss or damage, and shall have delivered promptly to USS a copy of the applicable police report; (c) Renter shall have provided to USS any additional documentation it may request relating to the loss or damage, and comply with any other requirements of this Agreement or the US Services' Owner Operator Agreement; and (d) Renter shall have complied with all provisions of the applicable insurance policy. In addition, Renter hereby agrees that Use Charges will continue to accrue with regard to such Unit until Renter has paid the deductible referred to in the US Services' Owner Operator Agreement.

10. ALL LAWS, RULES, AND REGULATIONS, whether governmental or otherwise, including, without limitation, the Federal Highway Administration (FHWA) annual inspection and compliance requirements, applicable to the use possession or control of the Equipment by Renter shall be complied with by Renter at Renter's expense. USS will provide, at its expense, original motor vehicle, registrations and license plates together with any required renewals. Renter shall be responsible for all other registration, license plate or other similar fees that may be required.

Renter                                                4                                    USS

11. ALL TAXES AND ASSESSMENTS including without limitation all import and customs duties and all withholding, property, sales and/or use taxes, and all penalties or other charges or fees arising out of or incident to the use, possession or control of the Equipment by Renter prior to its return to USS, shall be the responsibility of Renter. In order to avoid the obligation to remit any applicable withholding, property, sales and/or use tax to USS, Renter must provide a duly authorized exemption certificate issued by or acceptable to the relevant taxing authority.

12. NO ASSIGNMENT OR SUBLEASE by Renter of any interest is the Equipment shall be permitted without the prior express written approval of USS.

13. RENTER SHALL BE IN DEFAULT of this Rental Agreement: (a) if Renter fails to comply with any of the terms or conditions of this Rental Agreement; (b) if any guarantor of Renter's obligations hereunder attempts to or does cancel the guaranty; (c) if Renter is in default of any of the terms or conditions of any other agreement with USS, including but not limited to the US Services Owner-Operator Agreement; (d) if Renter becomes insolvent, or subject to any voluntary or involuntary bankruptcy proceeding- including acquiescence in the appointment of a trustee or receiver, or commencement of any dissolution or liquidation proceeding (hereafter individually or collectively referred to as Default); or (e) since Renter presents an abnormal risk of loss to USS, as determined by USS in its sole discretion, USS may require Renter to operate solely for USS as an 'owner operator' as a condition to entering into and maintaining this Rental Agreement. In operating solely for USS, USS may require Renter to generate a minimum amount of revenue per week of One Thousand Five Hundred dollars ($1500.00). If Renter fails to run exclusively for USS or fails to generate the minimum miles or revenue mandated under this Paragraph 13, then this too shall be a Default of this Agreement.

Is addition to any rights or remedies available at law or in equity, upon a Default by Renter, USS shall have the right: (a) to immediate possession of all outstanding Equipment, all of which is to be returned at Renter's expense, without further notice or statutorily mandated process; (b) to terminate this Rental Agreement (whereupon the terms and conditions shall continue to apply to the, Equipment then in the possession or control of Renter, until its redelivery); (c) to sums due and owing in accordance with the terms of this Rental Agreement, including, without limitation, unpaid use charges, taxes, costs of repossession and costs of repair; and (d) to any collection costs incurred in the recovery of any sums due or repossession of any Equipment including, without limitation, reasonable attorneys' fees.

14. NO WAIVER BY USS of any breach or Default hereunder, or omission or delay in USS exercising any of its rights hereunder, or course of dealing between USS and Renter shall operate as a waiver by USS to subsequently require full compliance with this Rental Agreement or as a waiver of any of USS' rights or remedies hereunder.

15. NO AMENDMENT OR ADDENDUM to this Rental Agreement shall be valid and binding on USS or Renter unless such amendment or addendum be in writing and signed

_WMR JR_
Renter

5

_HL_
USS

by both USS and Renter.

*WILLIE MURRAY ROBINSON JR*

16. WRITTEN NOTICES and other communications required by this Rental Agreement, including those required for billing purposes, may be sent, unless otherwise specifically provided by facsimile or certified mail. All notices to USS shall be sent to 351 E SR 434, Winter Springs, FL 32708, or sent by facsimile to 407-327-3019. All notices to Renter shall be sent to *P.O. BOX 115135*
*ATLANTA, GA. 30310-8135*

17. THIS RENTAL AGREEMENT shall be governed by the laws of the State of Florida. Renter further expressly agrees and stipulates that any legal proceedings involving or concerning this Rental Agreement shall only be properly conducted in the venue and jurisdiction of Seminole County, Sanford, Florida. This provision expressly is in consideration for USS entering into this Rental Agreement with Renter.

18. THE CONFIDENTIALITY of this Rental Agreement shall be strictly maintained by Renter and the terms and conditions hereof, including without limitation the Use Charges applicable hereunder, shall not be revealed or released to any third party (specifically to any other Renters).

19. ANY TERM OR PROVISION of this Rental Agreement that is declared or found to be illegal, invalid or unenforceable for any reason by a court of competent jurisdiction, such provision shall not affect the remaining provisions hereof, which shall remain in full force and effect.

*Willie Murray Robinson Jr.*
Renter

*01-04-05*
Date

*WMR Jr.*
Renter

6

*HD*
USS

# US Services Maintenance Program

The Equipment that is subject to this Rental Agreement shall be maintained by Renter at Renter's expense and Renter shall redeliver all Equipment to USS in the same condition as when received. In order to ensure that the Equipment is maintained in serviceable/adequate condition the following Maintenance Program must be adhered to by Renter. All costs for this maintenance will be paid directly by USS and charged back against the Maintenance Fund (as described in Paragraph 3 of the USS Rental Agreement). This Maintenance Program and Fund shall only apply during the Rental Period.

The following shall be required by the USS Maintenance Program:

1) <u>Weekly Odometer Reading.</u> The Equipment shall have its odometer read by a USS representative on a weekly basis at the USS terminal that Renter is based.

2) <u>Weekly Tire Inspection.</u> The Equipment shall have tires inspected by a USS representative on a weekly basis at the USS terminal that Renter is based. The tires' pressure and tread will be the chief parts examined.

3) <u>Annual Service.</u> After the initial twelve months of the Rental Agreement have passed, an Annual Service must be performed on the Equipment only at a location specified by USS.

4) <u>Regular/Periodic Service.</u> Regular periodic service shall also be required on the Equipment. For over the road (OTR) drivers, the Equipment must undergo regular service every ten thousand (10,000) miles. For city/local drivers, the Equipment must undergo regular service every ninety (90) days. For the purposes of this Addendum, a city/local driver shall be defined as any driver making *any* deliveries within fifty (50) miles of the USS terminal at which the driver is based.

_Willie Murray Robinson Jr_
Renter

_01-04-05_
Date

_W.M R.JR_
Renter

7

_HD_
USS

# US SERVICES RENTAL PROGRAM APPLICATION

In order to qualify for the US Services Rental Program, the Applicant must be qualified. In order to qualify, Applicant agrees as follows:

1) The Applicant must meet qualifications necessary to lease onto US Services (USS) DOT authority. This shall include meeting all necessary DOT-related pre-employment certifications (i.e. MVR check, drug test, etc.) as well as USS company standards.

2) The Applicant agrees to permit USS to perform or request background checks for Applicant's family, residential, education, military and criminal history, covering at least a five-year period immediately preceding the date of filing of the application.

3) Applicants employed by Fleet Owners currently leased onto USS's DOT authority may not qualify for the Rental Program without the Fleet Owner's express written consent, or until the Applicant is able to replace themselves with another driver that is acceptable to the Fleet Owner (with such acceptability not unreasonably withheld).

I agree to the above provisions and agree to permit USS to perform or request background checks for Applicant's family, residential, education, military and criminal history. I understand that even if I meet the qualifications for the US Services Rental Program, USS may still refuse to admit me to the program in their sole discretion.

_Willie Murray Robinson Jr._
Applicant

_01-04-05_
Date

_W.M.R.JR._
Renter

8

_tb_
USS

# Driver Deduction Consent

Renter specifically agrees and consents to the weekly deductions from Renter's pay of any debits to Renter's account. Such debits shall include, but not be limited to: insurance coverage(s) procured for Renter through USS; insurance deductible payments; driver advances for fuel; driver advances for maintenance and tires; Equipment rental payments; administrative or civil fines imposed by state or local governments on Renter; or any other debits made to Renter's account as a result of USS' temporary advance of funds on to Renter or on Renter's behalf.

_Willie Murray Robinson_
Renter

_01-04-05_
Date

_W.B.R. Jr._
Renter

9

_JD_
USS

# Rent To Own Program

## Estimated Weekly Driver Expenses
(Based on 2,000 miles driver per week)

Tractor-    1998 Volvo          Driver    **Willie Robinson**

| | |
|---|---|
| Weekly Rental Charge | 250.00 |
| Estimated Fuel Costs (6 MPG@1.65/ga.) | 550.00 |
| Maintenance Charge (.11 per Mile)    (1) | 220.00 |
| Estimated Bobtail & Phys. Damage Ins. (2) | 40.00 |
| Estimated Workers Comp. Ins. (2) | 35.00 |
| Total Estimated Weekly Expenses | 1,095.00 |

Explained to Driver by      *HERTCH & STEPHEN*

Driver has read & understands      *Willie Murray Robinson*

Date      *01-04-05*

(1) All funds withheld but not used will be returned to driver, except for administrative
    fees (.005/mile) upon completion of program.
(2) Estimated

Note: This form must be executed by driver and employee before rental agreemnent